ROBERT YBARRA, Jr., Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 13590

March 28, 1984 679 P.2d 797

[Rehearing denied July 27, 1984]

*Thomas E. Perkins,* State Public Defender, *Robert A. Bork,* Chief Deputy Public Defender, and *Laura FitzSimmons,* Deputy, Carson City, for Appellant.

*Brian McKay,* Attorney General, and *Dan R. Reaser,* Deputy, Carson City; for Respondent.

## OPINION

By the Court, STEFFEN, J.:
A jury convicted appellant Robert Ybarra, Jr. of one count

of first degree murder and one count each of first degree kidnapping, battery with intent to commit sexual assault and sexual assault and sentenced appellant to death and to three life sentences without the possibility of parole, which latter sentences the district court made consecutive. Our review of the record convinces us that Ybarra was fairly tried, convicted and sentenced. We therefore affirm.

## THE FACTS

On September 29, 1979, two Ely fishermen found a woman's purse and some signs of scuffling on an unpaved road outside of town. Soon thereafter they discovered the pathetic, living remains of a local sixteen-year-old girl named Nancy Griffith lying on the side of the road. One of the men testified, "[S]he was badly burnt. There was a deep gash in the left shoulder. The eyes were swollen shut; no hair. The face was unrecognizable." The fishermen mercifully covered her with their shirts, immediately drove back to Ely and returned with a sheriff's deputy. Although the deputy knew Nancy, he could not recognize her. Nancy was ultimately able to tell the deputy that she had been raped by a man in a red truck who worked north of where she was found. Nancy was rushed to a hospital in Salt Lake City, but died the following day.

The evening of September 28, 1979, Nancy and a girlfriend had met a man named Robert Ybarra in Ely. Ybarra worked at an oil rig north of where Nancy was found. Ybarra drove the girls around town in his red truck. Nancy's girlfriend was dropped off at her sister's because she wanted to go home. The last time the girlfriend saw Nancy was when she left her with Ybarra. The two girls arranged to meet later that evening, but Nancy never showed up.

Investigators probing the area outside of town discovered a quarter-mile trail of charred human skin and Nancy's burnt clothing leading to where her body was found. Evidence of a struggle and a burn area was also discovered, as well as a gas can. Ybarra's fingerprints were found on the gas can. Bootprints and tire tracks at the scene also matched Ybarra's boots and truck tires. Nancy's fingerprints were found on a beer can in Ybarra's mobile home.

The autopsy of Nancy Griffith, conducted on September 30, 1979, revealed that she had been party to sexual intercourse within the previous two or three days and she had suffered trauma to the genital area and a severe blow to the head. Nancy's death was caused by burns which seared her respiratory passages and charred eighty percent of her body surface. The burn patterns indicated that the flames which covered

Nancy's body were fueled by a flammable liquid which was ignited when she was either standing or sitting.

Ybarra was arrested on September 29, 1979 and charged one week later with the crimes for which he was eventually convicted. A sanity commission was ordered to examine Ybarra. Based on the commission's psychiatric reports, the district court concluded that Ybarra was competent to stand trial. At his arraignment Ybarra plead not guilty. Ybarra later changed his plea to not guilty by reason of insanity and not guilty.

Trial began on March 31, 1980. The jury was sworn in on April 7, 1980. That same day Ybarra withdrew his plea of not guilty by reason of insanity and made a motion for change of venue, which was denied. Ybarra appealed the denial to this Court. Our order dismissing the appeal was filed October 8, 1980.

During the interim appeal, Ybarra's counsel requested a second sanity commission examination. Two psychiatrists observed and examined Ybarra at Lake's Crossing Center, where he had been transferred until he could reasonably consult with his attorney. The district court later determined that Ybarra was competent to stand trial. Ybarra then changed his plea to again include not guilty by reason of insanity. Trial resumed on June 9, 1981. At that time, the district court conducted a supplemental *voir dire* of the jury and determined that the jurors had maintained their oaths.

Ybarra's counsel acknowledged in his closing argument that Ybarra had murdered Nancy, but challenged the other three felony counts.

At the trial's conclusion, the jury found Ybarra guilty on all four counts and sentenced him to three life sentences without the possibility of parole for the convictions of first degree kidnapping, battery with intent to commit sexual assault, and sexual assault. The district court made the life sentences consecutive. At Ybarra's penalty hearing, the jury found four aggravating circumstances and no mitigating circumstances sufficient to outweigh them.[1] Ybarra, as a result, was sentenced

---

[1]The jury found the following aggravating circumstances, each of which is contained in NRS 200.033, which lists the only circumstances by which murder in the first degree may be aggravated:

1. The murder was committed by a defendant who was previously convicted of a felony involving the use or threat of violence to the person of another.

2. The murder was committed while the defendant was engaged in the commission of forcible rape (sexual assault).

3. The murder was committed while the defendant was engaged in the commission of kidnapping in the first degree.

4. The murder involved torture, depravity of mind or the mutilation of the victim.

to death for the first degree murder conviction. Ybarra now appeals from each of his convictions and sentences.

## THE GUILT PHASE

Ybarra first asks us to disavow the M'Naughten rule as the test for criminal responsibility and in its place adopt a version of the American Law Institute standard. Although Ybarra thoroughly presented the arguments in favor of a new test for insanity, we decline to make a change and reaffirm this jurisdiction's use of the M'Naughten test for criminal insanity. Poole v. State, 97 Nev. 175, 625 P.2d 1163 (1981); Clark v. State, 95 Nev. 24, 588 P.2d 1027 (1979).

We likewise reaffirm our position that sanity is not considered an element of the offense which the prosecutor must plead and prove. Clark v. State, 95 Nev. 24, 28, 588 P.2d 1027, 1030 (1979). *Cf. In re* Winship, 397 U.S. 358 (1970); Mullaney v. Wilbur, 421 U.S. 684 (1975). Insanity is an affirmative defense which the accused, who is presumed sane, must prove by a preponderance of the evidence. 95 Nev. at 26, 588 P.2d at 1030; *accord,* Patterson v. New York, 432 U.S. 197, 205-07 (1977).

Ybarra also contends that admission of a graphic autopsy photograph of the victim at trial was inflammatory and prejudicial. Before admitting the photograph into evidence, however, the district court conducted an extensive precautionary review. Realizing the inflammatory potential of the photograph, the court admitted a reduction which was one-third the size of the original photograph the state sought to introduce. The court, moreover, determined that the photograph would aid a witness, a pathologist, in explaining the cause and circumstances of death. Admission of such evidence resides within the sound discretion of the trial court. Aguilar v. State, 98 Nev. 18, 22, 639 P.2d 533, 536 (1982); Turpen v. State, 94 Nev. 576, 577, 583 P.2d 1083, 1084 (1978), *cert. denied,* 439 U.S. 968 (1978). The trial court did not abuse its discretion in admitting the photograph.

Ybarra next argues that the district court erred by not dismissing, because of lost evidence, the counts of battery with intent to commit sexual assault and sexual assault. A vaginal swab and vaginal smear were preserved from the serous fluid drawn from the victim during the autopsy. The remainder of

the fluid was not preserved. Had it been preserved, Ybarra maintains, tests could have been performed which may have excluded him as a suspect. Experts testified, however, that the tests on the properly preserved swab or smear would have yielded the same results as the preserved fluid. Loss of the fluid, therefore, did not constitute lost evidence which resulted in any prejudice to the accused.

Finally, Ybarra claims he was denied his right to a speedy trial, because he was required to make an interim appeal of the district court's denial of his motion for change of venue.[2] Our expedited review of Ybarra's appeal, however, took less than three months after the briefs were filed. As our recitation of the procedural facts above reveals, the trial delays were principally attributable to defense tactics. Moreover, Ybarra has failed to demonstrate any prejudice to his defense as a result of our review of his interim appeal. Applying the factors adopted in Sheriff v. Berman, 99 Nev. 102, 106-07, 659 P.2d 298, 301 (1983), we conclude that Ybarra's right to a speedy trial was not denied.

## THE PENALTY PHASE

Ybarra's primary contention on appeal is that NRS 200.030(4) is unconstitutional, because it places the burden on the accused to prove that his mitigating circumstances *outweigh* the aggravating circumstances in order to avoid imposition of the death penalty.[3] Ybarra essentially argues that in a 50-50 case, when the aggravating and mitigating circumstances are equal, the death penalty should not be imposed. Neither the U.S. Supreme Court nor this Court has pronounced such a

---

[2]NRS 2.090(2) and 2.110, as they read in 1980, required a defendant to appeal a denial of his motion for change of venue after *voir dire* but before continuation of trial. Failure to make a direct interim appeal waived the issue for further review.

[3]NRS 200.030(4) provides:

4. Every person convicted of murder of the first degree shall be punished:

(a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

(b) Otherwise, by imprisonment in the state prison for life with or without possibility of parole. If the penalty is fixed at life imprisonment with possibility of parole, eligibility for parole begins when a minimum of 10 years has been served.

standard and we see no reason to do so. We accordingly hold that the challenged statute is constitutional.

[Headnote 8]

The jury at the penalty hearing was correctly instructed in accordance with NRS 200.030(4), 175.554(2) and (3).[4] The instruction read as follows:

> The punishment of death may be imposed only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances. Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole. (Instruction No. 6.)
>
> The burden rests upon the prosecution to establish any aggravating circumstance or circumstances beyond a reasonable doubt. (Instruction No. 7.)

In addition, our statutes provide, as the jury was instructed, that the sentencer cannot consider aggravating circumstances other than the nine factors listed in NRS 200.033, and that the sentencer must consider *any* mitigating circumstances. NRS 200.035(7).

The U.S. Supreme Court in Furman v. Georgia, 408 U.S. 238 (1972) and its progeny has articulated the standards by which we judge the constitutionality of our death penalty statutes. Our conclusion that Nevada's death penalty statutes are constitutional is consonant with the High Court's analyses of statutes in Gregg v. Georgia, 428 U.S. 153 (1976) and Proffitt v. Florida, 428 U.S. 242 (1976).

---

[4]NRS 175.554(2) and (3) provide:

2. The jury or the panel of judges shall determine:

(a) Whether an aggravating circumstance or circumstances are found to exist;

(b) Whether a mitigating circumstance or circumstances are found to exist; and

(c) Based upon these findings, whether the defendant should be sentenced to life imprisonment or death.

The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.

3. When a jury or a panel of judges imposes a sentence of death, the court shall enter its finding in the record, or the jury shall render a written verdict signed by the foreman. The finding or verdict shall designate the aggravating circumstance or circumstances which were found beyond a reasonable doubt, and shall state that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.

*Proffitt* is especially relevant, as Florida's death penalty statutes[5] provide that the sentencer shall consider whether mitigating circumstances outweigh aggravating circumstances.[6] 428 U.S. at 248-50. Therefore, in Florida, as in Nevada, the theoretical 50-50 case would result in imposition of the death penalty. The U.S. Supreme Court determined that Florida's death penalty statutes satisfied the constitutional deficiencies identified in *Furman,* because they required the sentencer to weigh aggravating and mitigating factors in imposing sentence. This balancing process causes the sentencer to focus on the circumstances of the crime and the character of the individual defendant, and to follow capital-sentencing procedures which are designed to preclude imposition of the death penalty in an arbitrary or capricious manner. As a further guarantee against arbitrary death sentences, the Florida appellate review system requires the Supreme Court of Florida to review and reweigh the aggravating and mitigating circumstances to independently determine whether the death penalty is warranted. 428 U.S. at 251-53.

Georgia's death penalty statute was upheld in *Gregg.* At the penalty hearing the sentencer considers any mitigating factors and any of ten statutory aggravating factors. After finding beyond a reasonable doubt the existence of one aggravating factor, the sentencer may elect to impose the death penalty,

---

[5]FSA § 921.141(2)(b) provides the jury, whose sentence is only advisory, with the following directions:

> 2. After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
>
> . . . .
>
> (b) whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; . . .

FSA § 921.141(3)(b) identically provides the judge with the following directions:

> 3. [I]f the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
>
> . . . .
>
> (b) that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.

[6]It is interesting to note (and this may be the source of Ybarra's confusion regarding this issue) that both the majority and Mr. Justice White in his concurring opinion recharacterized Florida's statutes as providing that aggravating circumstances must outweigh mitigating circumstances to impose the death penalty. 428 U.S. at 246, 260. The statutes, nevertheless, clearly provide that it is the mitigating circumstances which must outweigh the aggravating circumstances; if they do not, the sentencing judge is required to impose the death penalty.

apparently irrespective of whether mitigating factors outweigh aggravating factors. In addition, the Supreme Court of Georgia reviews the death penalty sentence to determine whether it was imposed arbitrarily and whether it is excessive or disproportionate to the penalty imposed in similar cases. 428 U.S. at 164-67. The majority in *Gregg* began by emphasizing that "[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity." *Id.* at 175. As in *Proffitt,* the Court also determined that the weighing of aggravating and mitigating factors by the sentencer in a bifurcated penalty proceeding, *id.* at 193-95, and the independent proportionality review by the state supreme court, *id.* at 204-06, met the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary and capricious manner.

 ██ ██

After comparing our death penalty statute with those of Florida and Georgia, we conclude that the challenged statute satisfies the constitutional measures estabished in *Furman, Gregg* and *Proffitt.* Specifically, the state is required to prove beyond a reasonable doubt in the penalty phase of trial, the existence of statutory aggravating circumstances; the accused is allowed to present evidence of any mitigating circumstances. The sentencing authority must then determine whether the mitigating factors outweigh the aggravating factors; if they do not, the death penalty may be imposed. This Court, under our present statutory scheme, is then required to review the death sentence for arbitrariness and disproportionality. NRS 177.055(2). Since our procedure for weighing aggravating and mitigating circumstances provides the sentencer with adequate information and guidance and the accused with sufficient guarantees that the penalty of death will not be imposed arbitrarily and capriciously, the challenged statute passes constitutional muster. Moreover, we have determined that the evidence in the instant case supports the finding of four aggravating circumstances. Our review of the record reveals that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor. We also conclude, after analyzing the circumstances of Ybarra's crime as required by NRS 177.055(2), that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases in this state, considering both the crime and defendant. *E.g.,* Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979). *Cf.* Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978) (life imprisonment); Pinana v. State, 76 Nev. 274, 352 P.2d 824 (1960) (life imprisonment).

Ybarra also contends that the admission of a probation order certifying a prior felony conviction as proof of an aggravating circumstance was error. Ybarra argues that the face of the order did not affirmatively state that Ybarra was represented at the prior conviction by counsel as required by Scott v. State, 97 Nev. 318, 630 P.2d 257 (1981). However, the minutes of the proceedings accompanying the order clearly state that Ybarra was represented by counsel. *Scott,* therefore, is inapposite. Admission of the evidence of the prior conviction was proper as proof of an aggravating circumstance. NRS 175.552; 200.033(2).

We also reject the contention that the district court was without jurisdiction to order that the three life sentences without the possibility of parole be made consecutive. The law is to the contrary. NRS 176.035(1).

Finally, we hold that the phrase "depravity of mind," contained in the death penalty statute (NRS 200.033(8)), is not impermissibly vague when, as in this case, the court meticulously defined it for the jury. Deutscher v. State, 95 Nev. 669, 677, 601 P.2d 407, 412-13 (1979). Here, the instruction given at the penalty hearing defining "depravity of mind" was identical to the instruction given in *Deutscher.*

We hold that all of the assigned errors raised by Ybarra are without merit in both the guilt and penalty phases of trial. Accordingly, we affirm the convictions of first degree murder, first degree kidnapping, battery with intent to commit sexual assault and sexual assault, together with the sentences imposing the death penalty and the three consecutive life sentences without the possibility of parole.

MANOUKIAN, C. J., and SPRINGER, MOWBRAY, and GUNDERSON, JJ., concur.