GERALD ARMOND GALLEGO, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 15932

December 20, 1985                                         711 P.2d 856

*Robert Bork,* State Public Defender, Carson City, *FitzSimmons, Lambrose & Perkins,* Carson City, for Appellant.

*Brian McKay,* Attorney General, Carson City, and *Richard A. Wagner,* District Attorney, Lovelock, for Respondent.

## OPINION

*Per Curiam:*

Two young women, Stacey Redican and Karen Twiggs, disappeared from a shopping mall in Sacramento, California, on April 24, 1980. Their brutalized bodies were discovered on July 27, 1980 in shallow graves in remote Limerick Canyon, Nevada. The hands of both girls were trussed with an uncommon variety of macrame rope. An autopsy revealed that both victims suffered violent deaths caused by multiple blows to the head with a hammer or hammer-like object.

According to the State's primary witness, Charlene Williams (aka Charlene Gallego), defendant had her entice the two victims into a van where they were forcibly confined, sexually molested by Gallego and ultimately transported to the place of their destruction. The gravamen of Charlene's testimony was that Gallego again transmogrified his "sex slave" fantasy into an intense, morbid reality. During the course of trial, evidence was adduced concerning similar conduct by Gallego in the earlier killing of two young women kidnapped from another shopping mall in the Sacramento area. The latter victims were felled by a number of bullets to the head, whereas Stacey and Karen had been viciously bludgeoned to death by a hammer that Gallego had purchased enroute to the fatal destination in Limerick Canyon.

The jury found Gallego guilty of two counts of murder in the first degree and two counts of kidnapping in the first degree with substantial bodily harm. Gallego was sentenced to death for Stacey and Karen's murder and received two consecutive sentences of life without the possibility of parole for the kidnapping counts. Having determined that no prejudicial error occurred in Gallego's trial, we affirm the convictions and sentences without exception.

### ISSUES ON APPEAL

Gallego raises twenty-one issues on appeal, a number of which we need not consider. Suffice it to say that the trial as a whole produced fairness to the defendant both in the guilt and penalty phases.

### I. *The Guilt Phase*

#### A.

#### *Change of Venue*

An accused is entitled to be fairly tried based upon evidence

adduced at trial, and that right remains inviolate in the face of apparent guilt, the most heinous criminal charges and a less than inspiring station in life. Irvin v. Dowd, 366 U.S. 717 (1961). Gallego contends that his due process right to fundamental fairness was emasculated beyond redemption by the inflammatory nature of the pretrial news coverage and the rural setting of the trial in Pershing County. Unquestionably, the combination of inflammatory pretrial publicity and a sparse population could produce an ambiance so fraught with prejudice that a fair trial would be unattainable. However, viewed within the context of the instant case, we have concluded that the confluence of the aforementioned concerns did not deprive Gallego of a fair trial.

It is true, as appellant emphasizes, that the local weekly newspaper of general circulation, the *Lovelock Review-Miner,* published a number of derisive articles about Gallego.[1] The Nevada news media throughout the State provided extensive pretrial coverage of the Gallego prosecution, including its sensational aspects. It may thus be fairly assumed that no geographical area within the State of Nevada having facilities available to accommodate defendant's trial would have been insulated from pre-trial publicity. It is equally clear that a change of venue would have intensified the media coverage accessible to residents of the area of the new trial site. Of paramount concern, then, is whether, in spite of the coverage, Gallego was accorded his constitutional right to a fair trial by a panel of qualified, impartial jurors.

Given the realities of our age, it is unlikely that a high-profile criminal defendant will be presented with a venire of uninformed individuals from which to select a jury. Indeed, it is conceded by many jurists that such a panel would least likely provide the considered, enlightened judgment that can best serve the demands of trial. As a result, courts abide by the following standards:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or

---

[1]Indeed, front-page articles referred to Gallego in terms of a sex slayer, convicted killer, accused sex slayer or condemned sex slayer. Telecasts received in the Lovelock area from Reno also made reference to Gallego's "sex-slave fantasy." Several articles in the *Lovelock Review-Miner* focused on the cost of the trial to Pershing County. Other comments related to trial donations made by interested parties from California, *e.g.,* "Here's five bucks to help you on the Gallego trial costs. Hang the bastard!" Reference was also made to California sources who decried California's infirmity in capital cases as opposed to a perceived willingness in Nevada to "do it right."

opinion and render a verdict based on the evidence presented in court.

Murphy v. Florida, 421 U.S. 794 (1975), quoting Irvin v. Dowd, *supra* at 723. *See also* Kaplan v. State, 96 Nev. 798, 618 P.2d 354 (1980). In analyzing the constitutional adequacy of Gallego's jury, it should be noted that not all of the circumstances contributing to the pre-trial atmosphere were adverse to Gallego. Importantly, the victims were not local girls. Moreover, it was evident that many residents of Pershing County were opposed to the trial situs because of the expense to the County. Finally, there were no publications of admissions or confessions attributable to Gallego.

Seven of the jurors were passed for cause by defendant. None of the jurors were shown to have formed the opinion that Gallego was guilty of the crimes with which he had been charged. All of the jurors selected indicated they could follow the law, and, if appropriate, return a sentence other than death if they found Gallego guilty. Gallego nevertheless contends that expressions of impartiality and commitment to decide the guilt or innocence of the defendant solely on the trial evidence were the conditioned responses to the admonitions of the trial judge. We do not agree. Although it is impossible to divine the true mind-set of any prospective juror, we are convinced from the record that the process of jury selection in the instant case yielded a jury panel committed to consitutional behavior.[2] The trial court did not err in rejecting Gallego's motion for a change of venue.

In reviewing the record, we are likewise convinced that defendant's subsidiary contentions concerning the trial court's rulings in: (1) defendant's challenges for cause; (2) refusing to grant defendant peremptory challenges in excess of the number provided by statute; (3) refusing to exclude the press and public from the voir dire of the venire; and (4) denying defendant's motion to sequester the jury during trial are all without merit. We likewise conclude that the trial judge did not commit error in addressing the venire concerning the duties of a juror.

### B.

*Testimony of Charlene Williams aka Charlene Gallego*

Gallego contends that the lower court erred in permitting Charlene Williams, aka Charlene Gallego, to testify as an accomplice to Gallego's crimes. Prior to Gallego's trial, Charlene had

---

[2] The degree of pre-trial publicity exposure among the jurors varied from superficial to reasonably detailed. Several of the jurors were aware of the defendant's prior homicide convictions in California. In each instance, however, the juror evinced a non-judgmental attitude and an understanding willingness to determine Gallego's guilt or innocence solely upon the evidence adduced at trial.

entered a guilty plea to two counts of second degree murder in the deaths of Karen and Stacey and had been sentenced in connection therewith. Charlene testified at trial that she had directly participated in the kidnapping and asportation of the two victims, knowing they would be killed. Under Nevada law, NRS 175.291,[3] the evidence against Gallego must be analyzed independent of Charlene's testimony in order to ascertain whether sufficient evidence otherwise exists tending to connect Gallego to the commission of the crimes. Defendant argues that no evidence independent of the accomplice testimony exists to link him to the two offenses charged. We disagree.

During the course of the trial, the State produced corroborative evidence that, in cumulative effect, sufficiently connected Gallego to the two murders. An uncommon variety of macrame rope was found in the trunk of Gallego's Triumph 1500 automobile that matched in all respects the rope that bound the two victims. The State also introduced a photograph taken of Gallego and certain friends several years before the killings at the identical site where the victims were found. The burial place for the two young women was a remote site in a vast desert area, a spot shown to be familiar to Gallego. Additionally, the State proved that the defendant was in Nevada at Lake Tahoe one day following the disappearance of the victims. Finally, evidence of the murders of Kippie Vaught and Rhonda Scheffler showed a common scheme or plan consistent with the kidnappings, sexual molestation and eventual killings in the instant case. The cumulative impact of the aforementioned corroborative evidence was sufficient to tie Gallego to the commission of the homicides without resort to Charlene's testimony. Accordingly, the trial court did not err in its ruling on this issue.

Gallego nevertheless contends that Charlene should not have been allowed to testify in any event because of the spousal privilege. This issue is also without merit. Unlike California, where the spousal privilege belongs to and may be waived by the witness, People v. Lankford, 127 Cal.Rptr. 408 (C.App.3d

---

[3]NRS 175.291 reads as follows:

   1. A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.

   2. An accomplice is hereby defined as one who is liable to prosecution, for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

1976), the Nevada evidence code precludes a wife from testifying for or against her husband without his consent. NRS 49.295(1)(a). Therefore, if Charlene and Gallego were lawfully married, her testimony against Gallego would have violated the spousal privilege.

The validity of the marriage Gallego seeks to invoke depends upon the effect of a California nunc pro tunc order entered approximately eighteen years after a 1964 Nevada marriage that was void ab initio under the laws of this State. Gallego contends that the aforesaid order reinstates a 1966 marriage which was otherwise void under Nevada law because the "marriage" was performed in Nevada at a time when only an interlocutory decree of divorce had been obtained with respect to Gallego's earlier California marriage. If Gallego's theory were correct, it would render two subsequent marriages (one of which was never terminated by divorce) void and a third marriage and divorce valid, thereby making his 1978 marriage to Charlene in Reno, Nevada, valid and subsisting at the time of trial. Gallego, who sought and obtained the California nunc pro tunc order in an attempt to successfully invoke the spousal privilege, was never lawfully wedded to Charlene. NRS 125.290 specifies that all marriages solemnized within this State wherein either of the parties have a husband or wife then living are void. Since the marriage that Gallego sought to validate by means of the nunc pro tunc order was void from the beginning, there was no marriage concerning which the California order could operate to save. Charlene's testimony did not violate the spousal privilege.

## C.

### Evidence of Uncharged Homicides

At trial, the State was permitted to introduce evidence of the September 11, 1978 Sacramento homicides of Kippie Vaught and Rhonda Scheffler. Purposes for which the evidence was admitted included common plan, intent, identity and motive, all exceptions to the Nevada evidence code prohibiting evidence of prior misconduct in order to show that the defendant acted in conformity therewith.[4] In prosecuting Gallego, the State theorized, as

---

[4]NRS 48.045(2) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

revealed by Charlene's testimony, that Gallego had been motivated by a sex slave fantasy that he had articulated to Charlene, to kidnap, sexually assault and ultimately murder youthful female targets.

The trial court did not err in permitting evidence of the prior killings to be introduced at trial. The homicides involving Kippie Vaught and Rhonda Scheffler were not remote in time from the killings here considered, substantial similarities were shown to exist in plan and intent, and the probative value of the evidence outweighed prejudice to the defendant. *See* NRS 48.035(1). The lower court so held, and we will not interfere with a discretionary ruling of the district court absent a showing that the ruling was manifestly wrong. *See* Brown v. State, 81 Nev. 397, 404 P.2d 428 (1965). Finally, evidence of the Vaught and Scheffler homicides satisfied the "plain, clear and convincing" standard required for its admissibility. *See* Tucker v. State, 82 Nev. 127, 412 P.2d 970 (1966).

## II. *The Penalty Phase*
### A.
### *Executive Clemency*

Gallego contends that the jury was given a misleading instruction concerning executive clemency that offends due process. Defendant argues that the instruction "invites speculation," "diminishes the jurors' individual and collective sense of responsibility" and, most important, misleads in not informing the jury that clemency is available to a defendant sentenced to a term of life without the possibility of parole. We do not agree. The identical instruction at issue here was given in Rogers v. State 101 Nev. 457, 705 P.2d 664 (1985), and we there determined that the instruction did not contravene constitutional standards. Constraints applicable to clemency instructions by reason of our holding in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), are of prospective effect and thus do not apply here. The trial court did not err on this issue.

### B.
### *Burden of Proof*

Gallego argues, as did the defendant in Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984), that a jury instruction based upon

NRS 200.030(4)[5] unconstitutionally shifts the burden to the defendant to prove that mitigating circumstances outweigh aggravating circumstances. We again conclude that this contention is without merit. Under Nevada's sentencing apparatus, the State is first required to prove one or more aggravating circumstances beyond a reasonable doubt. Thereafter, the defendant may show that the mitigating circumstances revealed by the evidence outweigh the aggravating circumstances proved by the State. Upon such a showing, the death penalty is no longer among the sentencing options. *See* NRS 175.554(2) and (3). As we held in *Ybarra, supra,* Nevada's statutory sentencing scheme, as it relates to the death penalty, supplies sufficient guarantees against the arbitrary and capricious imposition of the ultimate penalty to pass constitutional scrutiny. The trial court did not commit error in instructing the jury on this subject.

## C.

### *Evidence of Uncharged Homicides*

As noted previously, evidence of the prior, uncharged homicides of Kippie Vaught and Rhonda Scheffler was properly admitted during the State's case-in-chief for the limited purposes specified in NRS 48.045. During the penalty phase of Gallego's trial, the district court instructed the jury on the use of the evidence of these two killings as follows:

> You are instructed that with regard to evidence presented during the main trial or guilt phase in this matter, certain evidence was presented concerning the murders of Kippie Vaught and Rhonda Scheffler, which evidence was admitted at that time for limited purposes as previously explained to you.
> You may consider such evidence as bearing upon the defendant's character if you find that the Plaintiff has proved that matter beyond a reasonable doubt. That evidence, however, shall not be considered aggravating circumstance.

Gallego suggests that jury consideration of non-aggravating factors of the nature and severity of these uncharged homicides,

[5]NRS 200.030(4) provides:

Every person convicted of murder of the first degree shall be punished:

(a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

(b) Otherwise, by imprisonment in the state prison for life with or without possibility of parole. If the penalty is fixed at life imprisonment with possibility of parole, eligibility for parole begins when a minimum of 10 years has been served.

attenuates the intendment of Furman v. Georgia, 408 U.S. 238 (1972), to channel the discretion of the sentencing authority so as to avoid an arbitrary and capricious imposition of the death penalty. Additionally, it is argued that the interjection of such evidence fails to serve the necessary function of narrowing the class of persons against whom the death penalty may be invoked. We reject both contentions. The clearly defined, statutorily required, aggravating circumstances that must be found to exist beyond a reasonable doubt serve to narrow and confine the class of persons against whom the death penalty may apply. Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics. This process is facilitated by consideration of mitigating circumstances and other reliable factors relevant to the life of the defendant as a whole person. Only then may a sentencing authority render an informed judgment based upon the crime and the defendant who committed it.

If the death penalty option survives the balancing of aggravating and mitigating circumstances, Nevada law permits consideration by the sentencing panel of other evidence relevant to sentence. NRS 175.552. Whether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge.

In the instant case, it is clear that properly qualified evidence of the Vaught and Scheffler murders was highly relevant to meaningful considerations of Gallego's death worthiness. Such evidence not only impacted questions concerning the extent to which Gallego might pose a future threat to society, it also illumined issues concerning the extent to which Gallego's character was suited to assimilating acceptable norms of societal behavior. Contrary to defendant's assertions, evidence of the two uncharged homicides furthered the objective of seeking death penalty evaluation under a process of enlightenment that tends to suppress arbitrariness and caprice as vehicles of decision. The United States Supreme Court, in Barclay v. Flordia, 463 U.S. 939 (1983), declared:

> In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's

jury in determining the truth of the alleged special circumstances, the jury then is free to consider a myriad of factors to determine whether or not death is the appropriate punishment.

*Id.* at 950, quoting California v. Ramos, 463 U.S. 992 at 1008 (1983). The trial court committed no error on this issue.

### D.

*Evidence of Murders Occurring After the Instant Homicides for Which Gallego Had Been Previously Convicted*

Gallego objected to the admission of two murder convictions occurring in Contra Costa County Superior Court of California in 1983 as an aggravating circumstance under NRS 200.033(2). Since the two murders involved in the California judgment were committed subsequent to the murders in the instant case, Gallego contends the former killings do not qualify as an aggravating circumstance under the statute.

This issue is one of first impression in the State of Nevada. NRS 200.033(2) provides as follows:

The only circumstances by which murder of the first degree may be aggravated are:

. . . .

2. The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.

Gallego argues that the statute simply provides that a person who is convicted of murder and thereafter commits another murder will have the second offense aggravated by the first. Thus, Gallego concludes that since the June 1983 California convictions did not precede the 1980 killings of Redican and Twiggs, the admission of the former offenses as a statutory aggravating circumstance was error. Gallego is wrong.

Aggravating circumstances, as defined by the statute, provide direction to the sentencing authority as it considers an appropriate punishment for the defendant. The statute was never intended to operate on the vagaries of conviction sequences. Instead, the focal point is the time of sentencing. The sentencing panel is entitled to consider all relevant aspects of the defendant's criminal background prior to rendering sentence. The fact that Gallego murdered two victims after killing the two victims in the instant case is not relevant to the dictates of the statute. The clear language of the statute required only that Gallego stood convicted of the California murders at the time of the introduction of that evidence in the penalty phase of the present proceeding. It would

be both absurd and counterproductive for this Court to construe the plain language of the statute so as to exclude convictions of murders or crimes of violence occurring after the primary offense but prior to the penalty phase of a defendant's trial. This we refuse to do. The trial court did not err.

### E.
### *Sentencing Factors*

Finally, Gallego contends that his sentence of death was the product of passion, prejudice or arbitrary behavior on the part of the jury. We disagree. Our review of the record reveals that Gallego's sentence was not imposed under the influence of passion, prejudice or any arbitrary factor. Moreover, in conformity with statutory requirements existing at the time of the instant crimes, we have reviewed Gallego's sentence to determine whether it is excessive or disproportionate to the penalty imposed in similar cases in this State, considering both the crime and the defendant. We have concluded that it is not.

We have carefully examined the remaining contentions of error and conclude that they are without merit. Gallego was fairly tried, convicted and sentenced. The judgment of the trial court is therefore affirmed.

SPRINGER, C. J., MOWBRAY, GUNDERSON, and STEFFEN, JJ., and AGOSTI, D. J.[6]

---

[6]The Honorable Deborah A. Agosti, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CLIFF YOUNG, who recused himself. Nev. Const., art. 6, § 4.