## PRISCILLA FORD, Appellant, v. THE STATE OF NEVADA, Respondent.

### No. 14057

April 8, 1986 717 P.2d 27

*David G. Parraguirre,* Public Defender, *Lew Carnahan,* Deputy Public Defender, *Jane McKenna,* Deputy Public Defender, *Mark Mausert,* Deputy Public Defender, Reno, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, and *Gregory Shannon,* Deputy District Attorney; *Calvin R. X. Dunlap,* Reno, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

November 27, 1980 was a fateful Thanksgiving Day in the State of Nevada. Defendant below, Priscilla Ford, drove her mechanically sound 1974 Lincoln Continental automobile onto a

crowded sidewalk in downtown Reno. The resulting carnage included six dead and twenty-three injured.[1] After a jury selection process of nearly a month's duration, trial commenced on November 12, 1981, and concluded over four months later with the jury convicting Mrs. Ford of six counts of first degree murder and twenty-three counts of attempted murder. Subsequently, the penalty phase of the trial resulted in sentences of death on the six murder convictions and consecutive sentences of twenty years imprisonment on each of the twenty-three convictions for attempted murder. Mrs. Ford unsuccessfully appeals from her convictions and sentences as we have determined that she was fairly tried and sentenced.

## Procedural History

Mrs. Ford was arrested at the scene. Almost immediately her mental competence became a matter of focused concern. A series of psychiatric evaluations prompted by a defense motion for psychiatric examination culminated in a determination by the district court that Mrs. Ford was not competent to stand trial. After a period of treatment at Lake's Crossing that included a court-authorized, defense-resisted regimen of anti-psychotic drug therapy, the district court ordered a sanity commission consisting of three psychiatrists to examine Mrs. Ford. As a result of the commission's findings, the district court concluded that Mrs. Ford was mentally competent to undergo trial.

Several weeks prior to trial, defense counsel again moved the trial court for a psychiatric examination of the defendant. After the judge refused to hear the motion in chambers, defense counsel withdrew the motion. Later, when Mrs. Ford insisted on testifying, against her counsel's advice, counsel asked the court to refuse her the right to testify or order a psychiatric examination. At the time of Mrs. Ford's sentencing, defense counsel sought again to have the defendant evaluated by psychiatrists. The trial court denied both motions.

On May 19, 1982, Mrs. Ford filed a declaration of waiver of appeal here in the Nevada Supreme Court. We ordered the district court to canvass the defendant for purposes of determining her competence to waive her right of appeal. The trial court, refusing the prosecutor's request for a psychiatric evaluation, determined that Mrs. Ford had knowingly and intelligently waived her right to appellate review. We were unconvinced and

---

[1]Actually seven persons ultimately died as a result of impact with the vehicle driven by the defendant. The State elected not to amend the information as it existed at the time of trial. The murder counts therefore remained at six.

directed the district court to appoint a panel of three psychiatrists to examine Mrs. Ford to determine whether she was, indeed, competent to waive a right of such magnitude and consequence. The panel unanimously found that Mrs. Ford was not mentally competent to rationally elect to forego her right of appeal. We therefore rejected her attempted waiver and this appeal ensued.

## Issues on Appeal

Four issues were raised on appeal as a basis for relief from defendant's convictions and sentences. Considered individually or collectively, the issues do not justify interfering with the product of the jury's deliberations over the protracted course of defendant's trial.

### I. The Guilt Phase
### A.
### Change of Venue

Mrs. Ford challenges the trial court's ruling denying her motion for a change of venue. The trial court did not err.

In view of the pathos and fury permeating the Thanksgiving Day disaster, it is not difficult to appreciate the extent of media attention it received. Nevertheless, considerations compelling a venue change are not necessarily coextensive with the degree and nature of media coverage accorded the underlying criminal act. The preeminent issue in a motion seeking a transfer of trial site is whether the ambiance of the place of the forum has been so thoroughly perverted that the constitutional imperative of a fair and impartial panel of jurors has been unattainable. Kaplan v. State, 96 Nev. 798, 618 P.2d 354 (1980). The net concern of a criminal defendant is whether the community hosting the trial will yield a jury qualified to deliberate impartially and upon competent trial evidence, the guilt or innocence of the accused. This, of course, implicates the jury selection process and explains why a motion for a change of venue must be presented to the court after voir dire of the venire. NRS 174.455.

We have previously validated the tenet that an ignorant jury is neither the hallmark nor the sine qua non of a constitutionally qualified jury in today's society. See, e.g., Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985); cf. Irvin v. Dowd, 366 U.S. 717 (1961). It is clear on the record that virtually every juror had some pretrial awareness of the facts surrounding the incident on Thanksgiving Day. In support of the motion for venue change, defense counsel produced sixty-six newspaper articles pertaining

to the Ford incident.[2] Additionally, attention was drawn to the extensive publicity that occurred via television and radio. In short, defendant's criminal conduct on Thanksgiving Day, 1980, expectedly precipitated pervasive news coverage that undoubtedly reached a high percentage of Nevada residents, both in Reno and elsewhere throughout the State.[3]

Venue determinations are committed to the sound discretion of the trial judge and will remain undisturbed on appeal absent a clear demonstration of an abuse of discretion. Cutler v. State, 93 Nev. 329, 566 P.2d 809 (1977). Appellant has presented no such demonstration here. The trial judge pondered the nature and scope of the pretrial publicity surrounding the circumstances of this case and rightfully concluded that the totality thereof did not corrupt the trial atmosphere to the point of precluding a fair trial by an impartial jury. The pretrial publicity of the nuances of the holiday tragedy, its victims and perpetrator, could hardly be described as a monolithic condemnation of Mrs. Ford. Segments of reports were devoted to her history of mental illness and her claim of accident. Reports of her mental history or condition did not appear to be exaggerated or discounted. Moreover, given the fact that Mrs. Ford was indisputably behind the wheel of the death car, it was noteworthy that virtually all of the pretrial publicity was free of rhetoric ascribing legal guilt to Mrs. Ford. Both the seemingly senseless nature of the catastrophe and the speculation concerning Mrs. Ford's mental history and condition may have actually benefited defendant since her only plausible defense at trial was that of insanity.[4]

[2] The newspaper articles appeared in the *Nevada State Journal, Reno Evening Gazette* and *Reno Gazette Journal,* newspapers having circulation in the Reno area. Although reference was on occasion found among the articles to "Thanksgiving Day Massacre," the "death car" and analogies to a "battlefield," it is the media's credit that most of the reporting could be appropriately characterized as informative, restrained, non-inflammatory and even-handed. One article covering the memorial service for the victims referred to remembering the defendant with understanding rather than bitterness or outrage. Other articles addressed defendant's claim of accident and her questionable mental capacity. In sum, the pre-trial publicity attending this incident of such high public interest could not be accurately termed uniformly detrimental to Mrs. Ford by any means.

[3] The defense commissioned a survey involving a telephone poll of some 380 persons in the Reno area. This patently unscientific exercise did reveal that 97 percent of the people contacted were aware of the incident.

[4] Defendant also proceeded through trial under a secondary theory of accident. This theory was of slight consequence considering the unrefuted evidence of the mechanically sound condition of the vehicle and such declarations and admissions by the defendant as: "I will get you honkies," "I deliberately planned to get as many as possible. A Lincoln Continental can

Finally, the record reveals that the lengthy sifting process in the individual voir dire of the venire produced a trial-worthy jury. It is true that numerous veniremen were unsuited for jury service because of irredeemable prejudice, but that fact alone was not dispositive of the issue of venue. Moreover, given the uncontested involvement of Mrs. Ford in the calamity of Thanksgiving Day, it was significant that no venireman was asked whether he or she had formed an opinion as to Mrs. Ford's guilt under the law based upon her mental condition at the time of the incident. Since the question was not posed, the record reflects no instances where prospective jurors not discharged for cause admitted harboring preconceived opinions of the defendant's mental state or legal culpability at the time of the disaster. Most importantly, the trial judge, who witnessed the demeanor and apparent sincerity of the jurors at great length, accepted the declaration of each that he or she would forsake any opinion and follow the law and the evidence as presented during trial. Also, each juror expressed a willingness to entertain a sentence other than death in the event of a guilty verdict. Although defendant characterizes the aforementioned commitments as coached responses to improper importunings by the trial judge, we conclude to the contrary. The trial judge displayed great patience and concern in the process of selecting a jury panel genuinely committed to constitutional attitudes and behavior.

In Gallego v. State, *supra,* we said:

> Given the realities of our age, it is unlikely that a high-profile criminal defendant will be presented with a venire of uninformed individuals from which to select a jury. Indeed, it is conceded by many jurists that such a panel would least likely provide the considered, enlightened judgment that can best serve the demands of trial. As a result, courts abide by the following standards:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

101 Nev. 785-86, 711 P.2d 859 (citations omitted).

The trial judge determined that the ranks of the venire produced a jury composed of men and women legally qualified to

---

do a whole lot of damage, can't it?," "How many did I get?," "The more dead the better. Give the mortuaries the business. That's the American way. Did I get 50? How many did I get? I hope 75."

serve as jurors in defendant's trial. We discern no basis for holding otherwise. The trial court did not err in denying the motion for a change of venue.

## B.
### Challenges for Cause

Defendant contends that several prospective jurors never should have survived challenges for cause. The gravamen of this issue is that a number of veniremen presented no reliable evidence of impartiality, having merely parroted the symbols of impartiality orchestrated by the trial judge. A thorough examination of the record repels such a characterization of the unsuccessfully challenged individuals.

It is true that firm commitments of impartiality were often delayed because of vacillations stemming from several factors, not the least of which were the form and nature of questions posed by defense counsel. The latter aspect of the problem included such questions as: (1) "As you sit there right now and look over at Mrs. Ford, do you see her as an innocent person in all honesty?" (of course, the response was "no") and (2) "Do you think you are the kind of person that might have made the statement 'Whoever would do something like that ought to be taken out and shot?' " (the response was "right"). Other questions pertained to the unascertainable attitude of a man's subconscious mind and the comparison between a venireman's experiences in Viet Nam and the incident on Thanksgiving Day. In reviewing the very lengthy voir dire of the venire, at least four factors are clear. First, Mrs. Ford engaged in tragic, sensational behavior on Thanksgiving Day that resulted in pervasive news coverage of an event that naturally elicited strong feelings among informed, normal, humane elements of the community, state and national populace. Second, the passage of time and considerations beyond the immediate horror of the incident produced an attenuation of feelings among the venire. Third, given the fact that Mrs. Ford was concededly behind the wheel of the implement of death and injury, preconceived general opinions of guilt should not have been unexpected. The key question, never posed, was whether members of the venire had formed concrete opinions of the defendant's *legal guilt* based upon conclusions regarding her mental competence. It must be emphasized that the only credible defense raised to the crimes charged against Mrs. Ford was that of innocence by reason of insanity. Any venire in the country, thus informed of Mrs. Ford's involvement, could have responded affirmatively, in one voice, to a general question of Mrs. Ford's guilt. The difficult issue was deciding whether jurors

so informed would nevertheless fairly and impartially decide whether Mrs. Ford was guilty or innocent under the law based solely on the evidence produced at trial, including that evidence relating to her insanity defense. All jurors ultimately selected convinced the trial judge of their suitability under the constraints inherent in the latter issue. Fourth, individual responses to counsel and ultimately the presiding judge reflected unconditioned attitudes and commitments upon which the judge could properly base his decision regarding challenges for cause. In brief, we do not find on this record persuasive evidence of judicial brainwashing. Nor do we perceive error in the district court's rulings on this issue, including an ancillary ruling denying defendant's request for additional peremptory challenges not provided by statute. *See* Gallego v. State, *supra.*

## C.
### Competency Hearing

Defendant advances the dubious proposition that in spite of defense counsel's failure to recognize the need for a competency hearing throughout most of the trial, the district court, *sua sponte,* should have ordered such a hearing. Defendant's contention lacks merit.

The United States Supreme Court has declared the conviction of a criminal defendant while mentally incompetent a violation of due process. Pate v. Robinson, 383 U.S. 375 (1966). Moreover, we have held that a competency hearing is required when reasonable doubt exists on the issue. Melchor-Gloria v. State, 99 Nev. 174, 660 P.2d 109 (1983).

In the instant case, trial was scheduled after Mrs. Ford had been evaluated by a panel of psychiatrists and declared mentally competent to stand trial by the trial judge. Thereafter, the issue of mental competence did not arise until a few weeks before trial when defense counsel requested another psychiatric examination of the defendant. Inexplicably, the request was withdrawn when the judge refused to hear the motion in chambers. The motion was never formally renewed by defense counsel throughout the period of trial. We also note that this Court sustained defendant's objection to the continuation of mandatory ingestion of antipsychotic medication during trial, and granted mandamus directing the district court to vacate its order enforcing the administration of such drugs to Mrs. Ford. *See* Ford v. District Court, 97 Nev. 578, 635 P.2d 578 (1981). Our decision denying the State the right to impose continued anti-psychotic drug therapy on the protesting defendant was based upon the fact that Mrs. Ford had been determined to be mentally competent to stand trial and was thus outside the purview of Nevada's statutes mandating

detention and psychiatric treatment. *Id.* 579-80, 635 P.2d 579. Moreover, the finding of mental competence remained essentially free of challenge throughout the pretrial and trial periods.[5]

▬▬▬▬▬▬

Defendant contends that her trial behavior should have alerted the trial judge to the fact that her mental competence was reasonably in doubt. In support of this contention, we are directed to the lengthy trial testimony by both lay and expert witnesses, describing her history of aberrational behavior, mental disorders and institutional observation. Defendant also refers us to her insistence in taking the witness stand against the solemn advice of her counsel and the substance of her trial testimony. While Mrs. Ford's history reflects the hardships of a troubled person, it would be difficult to characterize that history in unequivocal terms. In any event, the historical testimony of Mrs. Ford's trials and tribulations related to periods substantially remote in time from the period in issue. Moreover, defense counsel is unpersuasive in raising defendant's insistence in testifying as evidence of mental incompetence. The trial judge examined Mrs. Ford regarding her desire to testify and found her responses consistent with those of an understanding, mentally competent person. Our reading of the record confirms the judgment of the trial judge in concluding that Mrs. Ford was competent and that there was no basis for any further hearing on that subject. On balance, the trial testimony given by the defendant likewise vindicates the district court's perception of her mental state.[6] As indicated previously, defendant's counsel apparently considered her to be competent until she insisted on disregarding his advice against testifying.

---

[5]During the latter stages of trial, defense counsel informed the trial judge that his client intended to take the stand contrary to his advice. Defense counsel contended that defendant's decision to take the stand was untimely and urged the court to deny her the opportunity to testify. Alternatively, counsel requested that Mrs. Ford receive a psychiatric examination. The trial judge recognized the constitutional right of the defendant to testify on her own behalf, Alicea v. Gagnon, 675 F.2d 913 (7th Cir. 1982), and that a denial of the right to so testify, even against her attorney's advice, is reversible error. Ingle v. State, 92 Nev. 104, 546 P.2d 598 (1976). Nevertheless, the judge carefully canvassed Mrs. Ford concerning her understanding of the consequences involved in taking the stand prior to denying the relief sought by counsel. Counsel's secondary request for a psychiatric evaluation of his client was made without specifications of incompetence. In any event, the judge was satisfied that Mrs. Ford had remained competent throughout trial to that point.

[6]While certain segments of the defendant's testimony may be described as somewhat bizarre, it is doubtful that they could be safely characterized as the unmistakable outpourings of a psychotic mind. For instance, given Mrs. Ford's views on religion and spirit matters, it is not altogether clear, as claimed by defense counsel, that she considered herself to be the solitary

The trial judge had the opportunity to evaluate Mrs. Ford's demeanor and the substance of her testimony during the course of a lengthy trial. At no time did the judge find cause to question defendant's competence. In reviewing the record, we are not persuaded that the district court abused its discretion in not ordering a psychiatric examination of the defendant during trial.

Defendant nevertheless points to this Court's determination that she was incompetent to waive her right of appeal as evidence of incompetence during trial. This contention is also without merit. Priscilla Ford's trial concluded in March, 1982. We declared her incompetent to waive her right of appellate review some twenty-one months later, in December, 1983. Considering the impact of a death sentence and her long-discontinued drug therapy, it is strongly possible, if not probable, that Mrs. Ford reached a level of incompetence during the lengthy interim between trial and our decision. Moreover, this Court's determination was a product of both a unified opinion of three psychiatrists and our concern that the vital right of review not be denied a defendant sentenced to death where evidence of the capacity to knowingly and intelligently waive that right was not clearly and convincingly demonstrated. In other words, we resolved the benefit of all doubt against waiver.

## D.
### *Validating Guilt Under M'Naghten Rule*

Defendant argues that the trial evidence conclusively negated the presumption of Mrs. Ford's sanity at the time of the offenses, thereby precluding consideration of the issue as a jury question. We disagree.

Under Nevada law, insanity is an affirmative defense which the presumedly sane defendant must prove by a preponderance of the evidence. Clark v. State, 95 Nev. 24, 588 P.2d 1027 (1979). The presumption of sanity operates most critically, of course, at the time the offense is committed. *See, e.g.,* Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); *see also* State v. Roadenbaugh, 673 P.2d 1166 (Kan. 1983); State v. Hartley, 565 P.2d 658 (N.M. 1977); State v. Romero, 684 P.2d 643 (Utah 1984); State v. Crenshaw, 659 P.2d 488 (Wash. 1983). This Court has long

embodiment of Christ and the Holy Spirit. Moreover, the articulate defendant also displayed the mind of one who is decidedly above average in intelligence. In any event, it is important to remember that the jury had extensive exposure to Mrs. Ford throughout trial and, considering the defendant's testimony and the conflicting views of the trial experts, determined that she satisfied the applicable law concerning the standard of competence to commit a criminal act.

adhered to the rule in M'Naghten's case as the test for criminal responsibility for the commission of an offense which, absent the requisite mental incapacity, constitutes a criminal act. Briefly stated, M'Naghten's rule provides:

> [I]f a man has capacity and reason sufficient to enable him to distinguish right from wrong as to the particular act in question, and has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, he is, in the eye of the law, of sound mind and memory, and should be held criminally responsible for his acts. . . .

State v. Lewis, 20 Nev. 333, 351, 22 P. 241, 247-48 (1889); *accord* Criswell v. State, 84 Nev. 459, 443 P.2d 552 (1968). Focusing on defendant's contention, it is apparent that the effect of the presumption of sanity may be negated only if: (1) the basic facts are unsupported by substantial evidence; (2) the basic facts are not otherwise established; or (3) the "evidence as a whole negatives the existence of the presumed fact." NRS 47.230(2). The presumption of sanity is not rebutted merely by a history of prior institutional commitments or diagnoses of mental deficiency or derangement. Legal insanity is not circumscribed in meaning or purpose by medical criteria concerning human psychosis. State v. Crenshaw, 659 P.2d at 491, 495.

As noted previously, evidence reflected the fact that Mrs. Ford has exhibited the attitudes and behavior of a troubled person over a prolonged period of years. Her life's experiences also proved her to be intelligent and resourceful, if not devious. On those few occasions, remote in time from the offenses here considered, when Mrs. Ford was institutionalized her periods of commitment were brief and uneventful. She functioned resourcefully in society and seemingly had little difficulty securing employment. In any event, the extent, if not the existence, of mental deficiencies in Mrs. Ford was sharply disputed by trial experts and lay witnesses. There was ample evidence for the district court to conclude that the issue of the defendant's mental capacity at the time of the Thanksgiving Day offenses should be decided by the trier of fact. A review of the record does not reveal error by the trial court in submitting this issue to the jury.

## II. *The Penalty Phase*

Defendant has not challenged the legal propriety of her sentences. It is nevertheless incumbent on this Court to review the ultimate sentence given to Mrs. Ford and determine its applicability under Nevada law as it existed at the time of her criminal

conduct.[7] We are therefore enjoined to determine whether (1) the evidence supports the finding of aggravating circumstances; (2) the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; and (3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in the State, considering both the crime and the defendant.

The jury found two statutorily defined, aggravating circumstances present in the commission of defendant's criminal acts: (1) The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person; and (2) the murder was committed upon one or more persons at random and without apparent motive. The jury specified that the two aggravating circumstances existed with respect to each of the six counts of murder and that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances. The jury then proceeded to fix the penalty at death. The record provides substantial evidential support for the jury's findings. Similarly, the record reveals no evidence undermining the jury's verdict by reason of the influence of passion, prejudice, or any arbitrary factor.

Finally, we conclude that defendant's sentence of death is not excessive or disproportionate to the penalty imposed in similar cases in this State, considering both the crime and the defendant.[8] Since the jury determined that Mrs. Ford was legally guilty of the crimes charged against her, thereby negating the defense of innocence by reason of insanity, it is not for this Court to diminish her punishment because of a conflict in the evidence regarding defendant's mental deficiencies. Suffice it to say that a jury consisting of impartial, fair-minded people could reasonably have concluded, on the basis of competent trial evidence, that defendant never proved by a preponderance of the evidence that the presumption of sanity was rebutted. In every other respect, defendant's sentence is proportionate to other death sentences

---

[7]NRS 177.055(2)(d) was amended to abolish the proportionality review requirement. This amendment took effect on June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against *ex post facto* laws requires that we apply the law as it existed when the crime was committed. *See* Goldsworthy v. Hannifin, 86 Nev. 252, 468 P.2d 350 (1970). In *Goldsworthy* we held that an act amending parole eligibility could not be applied to the detriment of a defendant whose crime was committed before the amendment took effect. Because Mrs. Ford's act took place well before June 6, 1985, we must conduct a proportionality review of her sentences.

imposed on Nevada defendants. *See, e.g.,* Gallego v. State, *supra;* Miranda v. State, 101 Nev. 562, 707 P.2d 1121 (1985); Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985); Wilson v. State, 101 Nev. 452, 705 P.2d 151 (1985); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979).

We have carefully examined the other nuances involved in the issues raised by defendant and conclude that they provide no basis for relief.

### Conclusion

Having concluded that Mrs. Ford was fairly tried, convicted and sentenced, we affirm in all respects the judgment of conviction and sentences imposed thereon.[9]

GUNDERSON and YOUNG, JJ., and WENDELL[10] and ROBISON,[11] D. J., concur.

---

[8]Notwithstanding our disposition of this appeal, we do not perceive this case to be among the brightest stars in the judicial firmament. The senseless nature of Mrs. Ford's conduct, coupled with her troubled and poignant history as wife and mother, lead us to conclude that the better course would have been a negotiated resolution assuring society of the defendant's permanent sequestration. Such a resolution would have been just considering the ambivalent nuances of her mental condition and the unrelenting obsession of a mother deprived of her child that haunted her life for many years prior to her unfocused act of vengeance. A partial list of direct trial costs involving special disbursements totaled $274,494. These costs do not include such allocable costs as attorneys' fees attributable to the district attorney's and public defender's offices, judicial salaries, judicial support staff salaries and the prolonged commitment of limited physical resources and facilities. All of the foregoing items are substantially increased by costs incident to this appeal and will continue to increase by future expenditures on such matters as determining the point at which Mrs. Ford will be competent to receive her decreed punishment.

[9]Under Nevada law, a person may not be punished for a public offense while incompetent. NRS 178.400. It is clear, therefore, that the execution of sentence shall not occur absent an appropriate predetermination of competence.

[10]The Honorable Michael J. Wendell, judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of CHIEF JUSTICE JOHN MOWBRAY, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.

[11]The Honorable Norman C. Robison, judge of the Ninth Judicial District Court, was designated by the Governor to sit in place of JUSTICE CHARLES E. SPRINGER, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.