CLAUDE FLENOY HUDSON, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 22134

September 3, 1992                    837 P.2d 1361

*Morgan D. Harris,* Public Defender and *Howard Brooks,* Deputy Public Defender, Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex A. Bell,* District Attorney and *Victoria Villegas,* Deputy District Attorney, Clark County for Respondent.

# OPINION

*Per Curiam:*

This is an appeal from a judgment of conviction, following a jury verdict, of one count of attempted murder with use of a deadly weapon. The district court sentenced appellant to two consecutive terms of fifteen years in the Nevada State Prison.

On January 23, 1990, the state filed an information in the district court charging appellant with one count each of attempted murder with use of a deadly weapon and changing, altering, removing, or obliterating the serial number of a firearm (a misdemeanor). The misdemeanor firearm charge was later dismissed.

At trial, the state's first witness was John Cooper, the owner of the First Choice Bicycle Shop. On September 7, 1989, Cooper opened his shop at about 9:00 a.m. and then went across the street to get some coffee and a paper. When Cooper returned to the shop, appellant was waiting out front. Cooper had seen appellant in the neighborhood, and Cooper thought appellant had been in the shop a couple of times. Appellant said "I thought you had locked yourself in." Cooper replied "no, I just went to get coffee." As Cooper opened the door and stepped inside the shop, appellant grabbed the door, ran in behind Cooper, and stabbed Cooper in the back twice before Cooper could turn around. Appellant stabbed Cooper a total of seven or eight times. Appellant and Cooper struggled until Cooper was able to retrieve a .357 magnum gun from Cooper's pocket and shot appellant three times. At that point two men from neighboring shops came into the store and pulled appellant from Cooper.

The state's next witnesses were Jerry Birchett and David Horn. Birchett was a neighboring shop owner, and Horn was an identification specialist with the Las Vegas Metropolitan Police Department. Neither witness added anything to the testimony of Cooper.

The defense case began with the testimony of appellant. According to appellant, he had a B.S. degree in English and was going to go to the University of Utah to get a Master's degree. Appellant explained that he first met Cooper when appellant got a flat tire on his bicycle. Cooper refused to patch the tube and insisted on selling appellant a new tube. To top it all off, Cooper charged appellant five dollars despite the fact that Kmart sells bicycle tubes for one dollar and seventy-seven cents. Over the last five or six years, everyone has been stealing from appellant, which enrages him.

When asked about his second encounter with Cooper, the following exchange took place:

A: I did. I had one more encounter with him.

Q: Did you have another encounter with John Cooper?

A: Yeah.

Q: What happened in that encounter?

A: That time somebody had stolen my bicycle and not only had they stolen my bicycle but it seemed to me it was almost like a conspiracy to steal the bicycle because I stopped at American Youth Hostel. The guy absolutely wouldn't let me use the phone. There was a phone outside that wasn't working. I told him I was in a big hurry. Let me call up this place to see if it was Gina—Gina Eckstein was singing. Well these people here that are over fifty-years-old or even younger may remember her Dad, Billy Eckstein, but I wanted to see Gina Eckstein and I was running real—there was a real shaky thing on time, you know, and he wouldn't let me use that telephone so I rode down the street to the first bar I came to. I laid the bicycle down and I rushed in there and put a quarter in the telephone to find out when this event was going to begin, and where it was—

. . .

A: So he put on a brand new spigot, or whatever it's called and charged me—I don't know how much it was now, but Bike World charged about—way less. And not only that but when I went to Bike World that time, which I went on a bicycle, they seemed to already know all about the deal and they didn't like it, but they, you know, when they told me the figures, you know, I can't explain it. They just seemed to know all about it and they didn't exactly—they showed no respect for John in his responses to me as to the spigot.

Q: Now, if I understand it right, are you saying that you actually went in there? You talked to John while he was fixing your bicycle?

A: I was in there two times. He offered to let me come in there and watch the fights with him. But I sure wasn't about to do that with a guy that charged me five dollars for an inner tube when it only needed a patch, so I knew I'd been robbed and there was nothing I could do. No, I wasn't going to watch boxing with him. I told John I used to live in Arkansas and I was probably the best fighter they had in Arkansas at that time, but I didn't tell him that. I just told him—I gave it to him in a funny way. You know, I told him that I went to the finals in both tournaments in Arkansas and lost a—I said I'm a two time loser in your state. Which was true, but you know, I didn't tell him the stories on it at all.

Appellant then proceeded with a rambling, semi-coherent story of hearing voices and being tortured and seeing flashes of light and finally deciding to go and talk to Cooper about Cooper stealing from him. Basically, appellant claimed that when he met Cooper at the shop that Cooper made some kind of rude remark, briefly turned his back, and then turned around and shot appellant. Appellant then stabbed Cooper in self-defense.

On cross-examination, the state argued with appellant over whether Cooper had a right not to patch Appellant's tire, talked about appellant studying psychology in college, and appellant explained again about hearing voices. Appellant explained that he stabbed Cooper because of everyone stealing from him and tampering with his bicycles, and Cooper happened to be available to stab. Appellant also explained that he stabbed Cooper because someone from next door came into the shop and was laughing while appellant was talking to Cooper. Appellant concluded that the person from next door was part of "this electronic deal, you know." When the deputy district attorney asked appellant how the serial number came to be removed from appellant's gun, appellant suggested that the deputy district attorney might have "scratched them off."

The defense next called Dr. Jack A. Jurasky, a psychiatrist. Dr. Jurasky graduated from medical school in 1946; in 1968, he was the Senior State Psychiatrist for the Mental Health Department of Nevada. Dr. Jurasky testified that appellant has a history of illegal activity and psychiatric illness going back twenty years, and that appellant has at various times been determined to be incompetent and has been committed to mental hospitals. Following an interview with appellant on November 13, 1989, Jurasky felt that appellant "was suffering from a mental illness of psychotic proportions, that also because of his inability to tell me the date and to do relatively simple problems that he may be suffering from some organic brain damage, and finally I felt he was not competent to assist counsel and that he should be in a mental hospital." Dr. Jurasky testified that "I think I took the position that he did not know right from wrong at the time of the alleged crime." On being pressed further on this point, Jurasky stated that "[appellant] simply did not know what was going on." Following extensive treatment at Lake's Crossing, Jurasky felt that appellant was competent to stand trial.

When presented with a hypothetical containing the facts of this case as testified to by Cooper, Dr. Jurasky testified that his conclusion would be that appellant would not have known right from wrong, and would not have understood the nature and quality of his acts during this unprovoked attack.

On cross-examination, Dr. Jurasky conceded that appellant

was smart enough to feign a mental disorder. Jurasky also conceded that a person who knew right from wrong might commit the acts appellant committed. Jurasky testified that appellant's actions at the bicycle shop would not necessarily prove that appellant was legally insane. Jurasky's views were influenced by the totality of the circumstances, including appellant's long history of mental illness. Appellant presented different faces and could appear quite rational, and then quite irrational.

The jury was instructed on the insanity defense, and returned a verdict of guilty. Appellant was convicted and sentenced as indicated above. This appeal followed.

Appellant contends that there was insufficient evidence to allow the jury to reject his insanity defense and find him guilty. Appellant argues that Dr. Jurasky testified that there were two conclusions that could be reached, depending on which set of facts was believed. If appellant's version of the facts was believed, then Jurasky believed that appellant could be sane. If Cooper's version of the facts was believed, then Jurasky felt that appellant was legally insane.

Appellant argues that appellant's version of the facts is inherently unbelievable. It is incredible to believe that a store owner simply turned around and shot a potential customer for no good reason. The only plausible story is that offered by Cooper; appellant was simply crazy.

Appellant points out that if a defendant can prove by a preponderance of the evidence that he did not know the difference between right and wrong, then he is entitled to be found not guilty by reason of insanity. Clark v. State, 95 Nev. 24, 588 P.2d 1027 (1979). Appellant urges that only one verdict was possible under the facts of this case; that appellant was not guilty by reason of insanity.

Appellant's argument is without merit. It is the jury's province to determine whether a defendant is legally insane. Aldana v. State, 102 Nev. 245, 720 P.2d 1217 (1986). Dr. Jurasky's testimony showed that appellant fluctuates between sanity and insanity and that appellant is a sophisticated person who is capable of misrepresenting himself to mental health professionals.

Jurasky testified that appellant's actions had to be interpreted in light of what appellant's motive was, and that there was no way to be sure what the motive was. Jurasky stated that a sane person, motivated by revenge, could overreact and attack someone, even though he knew the difference between right and wrong.

A mere history of mental illness is not enough to establish insanity. Ford v. State, 102 Nev. 126, 136, 717 P.2d 27, 33

(1986). The jury was entitled to believe that Jurasky was mistaken, or otherwise unworthy of belief. Accordingly, even though there was no expert testimony suggesting that appellant was sane, the jury was entitled to reach that conclusion. Accordingly, we affirm the judgment of conviction.

SPRINGER, J., dissenting:

Hudson was insane at the time he assaulted John Cooper. As the majority points out, Hudson recounted at trial a semi-coherent story of hearing voices, being tortured and seeing flashes of light. He imagined that John Cooper and others had been stealing from him. Hudson, who has a twenty-year history of disabling, psychotic mental disorder, has been admitted to a number of mental hospitals. The idea that he was feigning or simulating insanity (the only idea that even remotely supports the majority judgment) is ludicrous.

To the prosecution's credit, no experts were brought in by the State to say, under oath, that this manifestly insane man was perfectly sane; the only evidence on the issue is Dr. Jurasky's almost matter-of-fact testimony that, of course, Hudson was insane when he attacked Cooper for stealing from him. Thus, I conclude that no reasonable juror could have found Hudson sane. I fully realize that the Hudsons of our society are frequently segrated by putting them in penal institutions because there is no place else to keep them. Hudson does not belong in prison, so I must dissent from the judgment of affirming his conviction.