STATE of Iowa, Appellee,

v.

Albert Wayne WARE, Appellant.

No. 68554.

Supreme Court of Iowa.

Sept. 21, 1983.

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Atty. Gen., John P. Messina, Asst. Atty. Gen., and William E. Davis, Scott County Atty., for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, McGIVERIN, LARSON, and WOLLE, JJ.

WOLLE, Justice.

Defendant Albert Ware (Albert) appeals from his conviction by jury of murder in the first degree and robbery in the first degree. He contends that there was insufficient evidence independent of accomplice testimony to sustain the convictions. He also challenges the trial court's rulings on several pretrial motions and evidentiary questions that arose during the trial. Because we find no merit in any of Albert's contentions, we affirm.

Albert and his half-brother Daniel Ware (Daniel) were jointly charged, jointly tried, and both convicted of robbing and killing one Eugene Tappa on the night of November 19, 1981 in Davenport, Iowa. We are today filing our opinion deciding the issues raised by Daniel's appeal, *State v. (Daniel) Ware,* 338 N.W.2d 717 (Iowa 1983); the factual background and many of the legal issues are the same in both cases.

Eugene Tappa, the victim of the crime, was the proprietor of the Sports Page Lounge in Davenport. According to the testimony of the accomplice Dennis Williamson (Williamson), Albert, Daniel and

Williamson knew that Tappa routinely brought a large amount of cash to his bar on Thursday nights to cash payroll checks. The three first planned to steal the money from the trunk of Tappa's car while he was visiting at his girlfriend's house. Daniel phoned the lounge and was told Tappa had not arrived, indicating to the three that his car would be at his girlfriend's house. The three went to the girlfriend's house, found Tappa's car, and Williamson used a coat hanger to enter the front seat of the car. Williamson tried to "hot-wire" the trunk release mechanism inside the glove compartment of the car but was unsuccessful. The three left the car and returned to Daniel's place of business where Daniel again phoned the lounge. Learning that Tappa would arrive within a half hour, the three then decided to rob him in the lounge parking lot. Albert and Williamson were to accost Tappa while Daniel was to wait in the getaway truck parked nearby. All were armed, Williamson with a .25 caliber weapon and Albert and Daniel with .38 caliber handguns.

Williamson testified that when Tappa arrived at the parking lot, Albert ran to the car, put his handgun to Tappa's stomach, and told Williamson to grab the money. Williamson took the money bag from Tappa and ran down the alley. He became frightened, however, when he heard a "pop" which sounded like Albert's gun, so he did not stop at Daniel's truck but instead ran with the money bag through alleys to Daniel's auto repair shop. When Albert and Daniel returned, the three counted and divided the money. Williamson further testified that Albert told him at that time that he shot Tappa although "he didn't mean to."

I. *Sufficiency of the Corroborative Evidence.* Defendant contends that the testimony of Williamson was not sufficiently corroborated by other evidence. The State relies upon three pieces of corroborative evidence: (1) ballistics evidence that Tappa was shot by a bullet received by Albert from one David Ogburn; (2) independent evidence that the glove box was broken in the way Williamson described; and (3) testimony by persons in the lounge about Daniel's phone calls just before the attempts to take Tappa's money bag.

Iowa Rule of Criminal Procedure 20(3) (1981) provides:

*Corroboration of accomplice or person solicited.* A conviction cannot be had upon the testimony of an accomplice ... unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Corroborative evidence need not be strong and need not be entirely inconsistent with innocence. The existence of corroborative evidence is a legal issue, but its sufficiency is ordinarily a question of fact for the jury. *State v. Dickerson,* 313 N.W.2d 526, 529 (Iowa 1981). The requirement of corroborative evidence is met "if it can fairly be said the accomplice is corroborated in some material fact tending to connect the defendant with the commission of the crime." *State v. Vesey,* 241 N.W.2d 888, 890 (Iowa 1976); *State v. Dickerson,* 313 N.W.2d at 529. Corroboration is required not only to provide a firm connection between the accused and the crime but also to enhance the credibility of an accomplice whose involvement in the crime and self-interest in blaming the defendant severely erode his believability. *State v. Cuevas,* 281 N.W.2d 627, 629 (Iowa 1979).

Here, the independent evidence concerning the glove box and phone calls by Daniel to the lounge do tend to bolster the credibility of the accomplice Williamson. The critical corroborative testimony connecting Albert to the crime, however, is that concerning bullets he received from Ogburn. Because Albert contends Ogburn was himself an accomplice, a further recitation of facts is necessary.

David Ogburn, an acquaintance of Albert, testified that several weeks before Tappa was shot, Ogburn had given Albert twelve .38 caliber wadcutter bullets which belonged to Ogburn's father. Chemical

analysis of the wadcutter bullet removed from Tappa's body and bullets received from Ogburn's father showed that they had the same elemental composition. FBI ballistics expert, Donald Havekost, opined that the bullet found in Tappa was manufactured from the same batch of lead and at the same time and place as those in Ogburn's styrofoam holder from which David Ogburn had taken the wadcutters given to Albert. From this evidence the jury could reasonably have concluded that Albert shot Tappa with the bullet Ogburn gave him.

█ Albert argues that Ogburn was himself an accomplice as a matter of law, and since his testimony was not itself corroborated, it cannot be used to corroborate Williamson's testimony. The issue of who is an accomplice, however, was here a question of fact for the jury. Neither the evidence nor the court's instructions to the jury generated a jury question as to whether Ogburn was an accomplice. The jury instructions refer only to Williamson as an accomplice, and the record is entirely silent on whether Ogburn had an intent to aid the robbery in any way by providing bullets to Albert. There is no evidence tending to show that Ogburn knew how Albert planned to use the bullets, if indeed Albert planned to use the bullets in crime when he first received them from Ogburn.

█ We hold that the evidence tending to connect Albert with wadcutter bullets just like the one found in Tappa's body sufficiently corroborated Williamson's testimony.

█ II. *Was Sandy Cady Albert's Common-Law Wife?* Albert contends that the witness Sandy Cady was his common-law wife and was therefore incompetent to testify, with their conversations accordingly privileged. Iowa Code §§ 622.7, .9 (1981). The trial court held a separate hearing on the matter outside the presence of the jury, then found that Albert had not established the existence of a common-law marriage. The trial court committed no error by so ruling. The party claiming the existence of a common-law marriage must prove all ele-

ments of such a marriage by a preponderance of clear, consistent and convincing evidence. *In Re Estate of Dallman,* 228 N.W.2d 187, 190 (Iowa 1975). The trial court's findings of fact on whether or not a marital relationship exists have the effect of a jury verdict. *State v. Arnold,* 225 N.W.2d 120, 121 (Iowa 1975). There was substantial evidence supporting the trial court's finding of no common-law marriage. Sandy Cady and Albert filed separate, single-status tax returns for 1981, maintained separate bank accounts, owned little jointly held property, and produced no witnesses other than themselves to testify that they had held themselves out as husband and wife. Because Albert failed to prove that he was married to Sandy Cady, she was competent to testify and her conversations with him were not subject to a spousal privilege.

III. *Impeachment of the Witness Cady.* Albert contends that the trial court erred in admitting into evidence a written statement given by Albert's girlfriend Sandy Cady to Detective Hammes of the Davenport police department. A few months after Tappa was shot and killed, Cady gave an oral and subsequent handwritten statement implicating Albert, Daniel and Williamson in the robbery and murder. Cady was listed in the minutes of testimony and called as a trial witness by the State. She first denied having knowledge of facts implicating Albert. Confronted with her previous statements, she said she had been forced to give the statements, that nothing in them was true. She further testified that Albert had been home with her the night of the murder, thereby supporting his alibi defense. After the prosecutor had questioned her about specific parts of the statement, the handwritten statement was offered and admitted for impeachment purposes, with the trial court overruling defense counsel's objection that the statement was incompetent, irrelevant, immaterial and constituted hearsay.

On cross-examination, Cady testified further about the involuntary aspects of the statements and in further support of Albert's alibi defense. Subsequently, the

State called Detective Hammes as a witness, and he was allowed to read the written statement to the jury, the court again overruling defense counsel's hearsay objection.

Albert contends that the trial court erred in allowing the statement to be admitted into evidence and read to the jury. He asserts that once Cady admitted making the statement, the purpose of impeachment was completed and the statement could not further be used for any purpose whatsoever. For authority he relies upon the following language in *State v. Wolfe,* 316 N.W.2d 420 (Iowa Ct.App.1981):

> Once the witness's attention is drawn to the prior statement, if he admits making the prior inconsistent statement, then that prior statement is not admissible. But if he denies making the prior statement, or is evasive in his answer, or cannot remember making it at all, then the statement may be admitted into evidence for purposes of impeachment.

316 N.W.2d at 422.

■ The admission of Cady's written statement and the reading of that statement to the jury are not grounds for reversal because the objection now made was not raised in the trial court. Neither the general objection nor the hearsay objection that was made by defense counsel alerted the trial judge to the problem addressed in *State v. Wolfe,* a problem concerning use of a statement to impeach rather than a problem of relevancy or hearsay. The objections that were made were properly overruled because the statement was offered and admitted only for the purpose of impeaching Cady, not substantively to prove the truth of what the statement contained. Both at the time the objections were overruled and in instructing the jury at the close of the case, the trial court advised the jury that the out-of-court statements were only for impeachment purposes. Albert's complaint about the trial court's ruling was not adequately raised by proper specific objection, and that complaint was therefore waived. *State v. Mark,* 286 N.W.2d 396, 408–09 (Iowa 1979); *State v. Winquist,* 247 N.W.2d 256, 259 (Iowa 1976).

■ Even if defense counsel had specifically objected on the ground now urged, we believe the trial court would not have erred in admitting the witness's statement and allowing it to be read to the jury. *State v. Wolfe* does indicate that an impeaching written statement ought not itself be admitted in evidence if the witness admits making the statement. We believe, however, that the better rule is that found in Federal Rule of Evidence 613(b) which now has been adopted as Iowa Rule of Evidence 613(b), with an effective date of July 1, 1983. Rule 613(b) provides:

> Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2), Iowa Rules of Evidence.

Although that Iowa Rule of Evidence was not yet in effect at the time of trial, the trial court would not have erred in overruling a specific objection based on *State v. Wolfe* and allowing the jury to read and hear exactly what Cady had previously written which at trial she attempted to explain away. We think this Iowa Rule of Evidence to be the sounder approach, for it provides to the witness and opposing counsel full opportunity to explain the inconsistency in previous out-of-court statements while allowing the finder of fact to have the exact words of the prior statement for purposes of comparison with in-court inconsistent testimony. We agree with Wigmore who advocated the expanded use of out-of-court statements to assure impeachment with reliable, complete and accurate sources of information—the original written statement if possible. See IIIA Wigmore, *Evidence* §§ 1036–37 at 1041–46 (Chadbourn rev. ed. 1970).

The trial court did not err in allowing the reading of the Cady statement and admitting it into evidence for impeachment purposes only.

IV. *Denial of Motion for Change of Venue.* Albert contends that unfavorable pretrial publicity denied him his right to a fair trial. The trial court denied his pretrial motion for change of venue, stating that the newspaper articles attached to Albert's motion were "neither inflamatory nor their numbers so pervasive as to create a substantial likelihood that a fair and impartial trial cannot be held in Scott County, Iowa." The court noted that a survey undertaken by a private firm retained by the prosecution showed that eighty percent of those polled had not formed an opinion as to the guilt or innocence of the Ware brothers.

■■■ We have reviewed the record de novo making an independent evaluation of the circumstances to determine whether the trial court abused its discretion in denying the request for change of venue. We agree with the trial court's characterization of the newspaper publicity. The ultimate question is whether defendant demonstrated a substantial likelihood that he would not receive a fair and impartial trial in Scott County. Iowa R.Crim.P. 10(9)(b); *State v. Chadwick,* 328 N.W.2d 913, 915, (Iowa 1983); *State v. Cornelius,* 293 N.W.2d 267, 268–69 (Iowa 1980). As we said in *Chadwick:*

> Mere exposure to news accounts does not prove a substantial likelihood of prejudice. (Citation omitted). Voir dire of prospective jurors should be trusted to expose any substantial prejudices among the jurors.

328 N.W.2d at 916. The trial court did not abuse its discretion in denying the motion for change of venue.

■■■ V. *Albert's Motion to Sever.* Albert contends that the trial court erred in denying his motion to sever, in effect a motion for separate trials of Albert and his half-brother Daniel. He points out that Daniel's attorney cross-examined the accomplice Williamson about a robbery to which he pled guilty and showed that Williamson did not commit the robbery alone and also that he did not commit the robbery with Daniel. Albert contends that that testimony was unfairly prejudicial because the jury could infer that Williamson committed the robbery with Albert.

Iowa Rule of Criminal Procedure 6(4)(b) provides:

> *Prosecution and judgment.* When an indictment or information jointly charges two or more defendants, those defendants may be tried jointly if in the discretion of the court a joint trial will not result in prejudice to one or more of the parties. Otherwise, defendants shall be tried separately. When jointly tried, defendants shall be adjudged separately on each count.

In *State v. Belieu,* 288 N.W.2d 895, 900 (Iowa 1980), we held that the denial of a motion to sever will be deemed an abuse of discretion only if the defendant proves sufficient prejudice to constitute a denial of a fair trial. There we found that the adverse effect of other-crimes evidence introduced against a co-defendant so implicated the defendant as to establish unfair prejudice and require separate trials. The record here shows no such prejudice. On only one occasion did cross-examination by Daniel's counsel generate a possible adverse inference—the suggestion that Albert may have accompanied Williamson during another robbery. Standing alone, that possible but rather uncertain inference does not constitute such prejudice to Albert as to deny him a fair trial. The trial court did not err in overruling Albert's motion to sever.

VI. *Denial of Motion for Continuance.* An important witness for the State was Donald Havekost, who explained the results of the FBI neutron activation analysis and gave his opinion that the bullet which killed Tappa was like the bullets Ogburn gave to Albert. Less than a week before trial was to commence, Albert requested a continuance for the purpose of obtaining an expert witness to do similar tests and provide expert testimony on the same subject. After a hearing which included a lengthy tele-

phone conference involving the court, counsel and the proposed defense witness Terry Baxter, the trial court denied the application for a continuance. The court found that Baxter would have time to secure scientific analysis comparable to that possessed by the State and be ready to testify as an expert witness by the time his opinions would be needed at trial.

Albert argues that Baxter needed at least thirty days to perform the test he planned, involving analysis of more chemical elements than those tested by the FBI. He contends the trial court abused its discretion in denying a continuance and thereby depriving him of expert testimony that may have aided in his defense.

■■■ The trial court is accorded broad discretion in ruling on motions for continuance. *State v. Kyle,* 271 N.W.2d 689, 691 (Iowa 1978); *State v. Jacoby,* 260 N.W.2d 828, 833 (Iowa 1977). Iowa Rules of Civil Procedure 182 and 183 apply both to civil and criminal cases; they require a timely request and a showing that substantial justice will be more nearly obtained by granting of the continuance. Iowa R.Civ.P. 182(b). Here, Albert did not meet his burden to show that a continuance would enhance his presentation at trial and allow him more nearly to obtain substantial justice. The witnesses Baxter and Havekost were both interviewed by the court, by agreement of the parties, and both explained the purpose of neutron activation analysis and the usual analyses performed. The court fairly concluded from what they both said that Baxter would have adequate time to prepare for his participation as a witness at trial and would not likely enhance his preparation by doing more extensive tests. No showing was made that any additional tests would yield more meaningful results or change or strengthen the substance or credibility of Baxter's testimony.

The trial court did not abuse its discretion in denying Albert's motion for continuance.

VII. *Adequacy of the Jury Instructions.* Albert contends that the trial court's instructions were erroneous in two respects: first, that the jury was not clearly informed that malice aforethought is a necessary element of murder in the first degree; and second, that the jury was erroneously informed that there were no included offenses on the felony murder charge.

■■ The first contention is without merit. Consistent with Iowa Code sections 707.1 and 707.2 (1981) and *State v. Galloway,* 275 N.W.2d 736, 738 (Iowa 1979), jury instruction 18 which defined both first and second degree murder specifically stated: "Both degrees of murder involve malice aforethought." Instruction 18 therefore adequately required the State to prove malice aforethought; the instructions were not erroneous in that respect.

Albert also contends that he was entitled to have the lesser included offenses of voluntary and involuntary manslaughter submitted to the jury not only as to premeditated first degree murder but also as to felony murder. (He made no request that second degree murder be submitted, did not object when it was not, and does not here contend that it should have been included in the instructions.)

■■ Lesser offenses must be submitted to the jury as included within the charged offense if but only if they meet both the appropriate legal and factual tests. *State v. Sangster,* 299 N.W.2d 661, 663 (Iowa 1980); *see* Iowa R.Crim.P. 6(3), 21(3). Voluntary and involuntary manslaughter are both legally included offenses of a felony murder charge by the express statutory language in Iowa Code sections 707.4 and 707.-5. We find, however, that there was no factual basis in the record here for submission of either voluntary or involuntary manslaughter under the applicable definitions of those crimes in our present Iowa statutes and recent court decisions.

■■ Voluntary manslaughter is quite specifically defined in Iowa Code section 707.4. A factual prerequisite for Albert to have been convicted of that crime was that he must have acted "solely as the result of sudden, violent, and irresistible passion resulting from serious provocation sufficient

to excite such passion in a person . . . ." Iowa Code § 707.4 (1981). Nothing in this record suggests the presence of any of those factors in the killing of Tappa on the evening in question. There is no evidence that either Albert or Daniel acted out of "passion resulting from serious provocation," or that "sudden, violent, and irresistible passion" was in any way involved. Voluntary manslaughter was not here a factually-supported lesser included offense.

The Iowa Code provides two definitions of involuntary manslaughter, the first constituting a felony and the second an aggravated misdemeanor:

707.5 Involuntary Manslaughter

1. A person commits a class "D" felony when the person unintentionally causes the death of another person by the commission of a public offense other than a forcible felony or escape.

2. A person commits an aggravated misdemeanor when the person unintentionally causes the death of another person by the commission of an act in a manner likely to cause death or serious injury.

 The subsection 1 definition was not factually supported here because there was no evidence nor contention by any party that Albert or Daniel was participating in a public offense other than the charged felony of robbery. Robbery is specially characterized as a forcible felony in Iowa Code section 702.11. Therefore, the evidence here in no way factually supported "commission of a public offense *other than a forcible felony*." Iowa Code § 707.5(1) (1981) (Emphasis added).

 Neither did the evidence here provide factual support for the subsection 2 definition of involuntary manslaughter. In several recent cases this court has compared and explained the elements of the two involuntary manslaughter crimes defined in section 707.5. In *State v. Conner,* 292 N.W.2d 682, 686 (Iowa 1980), we held that recklessness is a necessary element in involuntary manslaughter. In *State v. Inger,* 292 N.W.2d 119, 122–24 (Iowa 1980), and again in *State v. Dvorsky,* 322 N.W.2d 62,

66 (Iowa 1982), we held that the word "act" in the section 707.5(2) definition is an act that is not a public offense as defined in section 707.5(1). We said in *Inger:*

> Such a reading also removes the incongruity of having a person, through the commission of one act, be equally guilty of both subsections (1) and (2), which would leave the degree of punishment to be determined by the fact finder on no legally distinguishable basis.

292 N.W.2d at 124. Using the same reasoning, we now hold that the term "act" in section 707.5(2) means an act that is neither connected with a "public offense" nor with a "forcible felony or escape" as those terms are used in the section 707.5(1) definition of involuntary manslaughter. Such a reading removes the potential incongruity of treating homicide which occurs during a forcible felony as too serious for the crime which is a Class D felony, yet falling within the less serious aggravated misdemeanor definition. This interpretation also accomplishes for the involuntary manslaughter crimes what the legislature seems to have intended throughout Iowa Code chapter 707—a gradation of culpability commensurate with the gradation of punishment. *See State v. Conner,* 292 N.W.2d at 684. It is entirely reasonable to infer from the statutory scheme in chapter 707 that a person who causes death during the reckless commission of a "forcible felony or escape" cannot be found guilty of the lesser offense of involuntary manslaughter. If that person is not convicted of a crime more serious than the offenses defined in section 707.5, the person cannot be convicted at all.

 Turning again to the facts here, the record provides no support for convicting Albert or Daniel of the subsection two type of involuntary manslaughter. The evidence shows that a bullet fired from Albert's handgun killed Tappa and that the handgun was fired in connection with the robbery of Tappa, activity which constitutes a forcible felony and is excluded from both definitions of involuntary manslaughter. No other theory was suggested as to the circumstances under which the bullet was fired, wheth-

er the actual triggering of the bullet be found intentional or unintended. Albert's alibi defense based on Sandy Cady's testimony did not lend itself in any way to submission of any manslaughter offenses. There was simply no evidence from which a reasonable jury could conclude that the act which caused Tappa's death was unrelated to the commission of the robbery even if it believed that the actual firing of the handgun was unintentional. Neither did the evidence sufficiently disclose the manner of this killing, if it were not done as Williamson said, to enable a jury to find that Albert or Daniel committed any act not connected with a robbery "in a manner likely to cause death or serious injury," a definitional prerequisite under section 707.5(2).

This case is distinguishable from cases decided under our definitions of manslaughter which preceded adoption of the Iowa Criminal Code effective January 1, 1978. Prior to that date manslaughter was defined only by case law; some of the earlier definitions are catalogued in *State v. Conner,* 292 N.W.2d 682, 685–86 (Iowa 1980). For example in *State v. Cuevas,* 282 N.W.2d 74, 78 (Iowa 1979), this court reversed a first degree murder conviction because the trial court failed to include as lesser offenses second degree murder and manslaughter. Nowhere in that decision is manslaughter defined nor the type of manslaughter which should have been included in the instructions discussed. We believe the facts in *Cuevas* would not have supported a conviction of any manslaughter crime under our present statutory definitions. Similarly in *State v. Millspaugh,* 257 N.W.2d 513, 516 (Iowa 1977), a conviction of first degree murder was reversed because neither second degree murder nor voluntary manslaughter was submitted as a lesser included offense. There, however, voluntary manslaughter was defined much less restrictively than in our present statute—Iowa Code section 707.4. In *Millspaugh* this court found a sufficient factual basis for submission of voluntary manslaughter in the evidence showing that defendant intentionally killed his victim though perhaps not with malice aforethought nor in the perpe-

tration of a robbery. 257 N.W.2d at 516. The court there did conclude that involuntary manslaughter was not factually supported as a lesser included offense because there was not "substantial evidence of criminal negligence," which again suggests how different are our present statutory definitions of involuntary manslaughter. Both *Cuevas* and *Millspaugh* might have been decided differently if they had been decided under our present definitions of voluntary and involuntary manslaughter.

Finally, we note that our conclusion is consistent with principles enunciated in our recent case of *State v. Morgan,* 322 N.W.2d 68 (Iowa 1982). There we held that if a major offense consists of three elements, with the lesser offense consisting of only two of those elements, the lesser offense need not be submitted if the record does not contain substantial evidence from some quarter controverting the third element— that which elevates the lesser offense to the greater offense. 322 N.W.2d at 69–70. Here that third element was the contention that Albert killed Tappa while participating in a forcible felony—a robbery. No substantial evidence controverted the fact that Tappa was killed with a bullet and that the bullet was fired by someone during a robbery committed in the manner described by Williamson. If the killing was not directly connected with a robbery, nothing in the record told the jury how the homicide occurred. The serious factual question in the case was not whether there was a robbery and killing, but who was involved. Albert's principal factual defense during the trial was the alibi testified to by the witness Sandy Cady. If the jury had believed that alibi, Albert would have been acquitted. He would not have been subject to conviction of some lesser homicide offense.

Because there was not evidence from which a jury could reasonably conclude that voluntary or involuntary manslaughter was committed by Albert, the trial court did not err in refusing to submit lesser included manslaughter offenses for the jury's consideration.

VIII. *Brevity of Jury Deliberations.* The twelve trial jurors deliberated for one and one half hours before returning their verdicts of guilty. Albert asserts that it is "wholly inconceivable" that the jury could have read and followed all the instructions, applied them to the facts, deliberated meaningfully, and arrived at fair verdicts in such a short time.

First, the claim was waived because it was not raised by defendant in a motion for new trial. *State v. Hansen,* 286 N.W.2d 163, 165–66 (Iowa 1979).

In any event, there is no merit in Albert's complaint. Ordinarily the brevity of jury deliberations has no effect upon the validity of either civil or criminal verdicts. *State v. Chadwick,* 328 N.W.2d at 918; *Lappe v. Blocker,* 220 N.W.2d 570, 574 (Iowa 1974). Contrary to Albert's assertion, nothing was so complex about the evidence in this case or the jury instructions (all of which the jurors heard before beginning their deliberation) that would render inconceivable the return of fair verdicts after one and one half hours of jury deliberation.

Defendant Albert Ware received a fair trial, and his assignments of error are without merit. His convictions are affirmed.

AFFIRMED.