NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, S. DAVID BERST, AND ROBERT L. STROUP, II, APPELLANTS, *v.* JERRY TARKANIAN AND LOIS TARKANIAN, RESPONDENTS.

No. 28508

May 22, 1997　　　　　　　　　　　　　939 P.2d 1049

[Rehearing denied July 16, 1997]

*Thorndal, Backus, Armstrong & Balkenbush* and *Craig R. Delk* and *Stewart C. Fitts,* Las Vegas; *Swanson, Midgley, Gangwere, Kitchin & McLarney,* Kansas City, Kansas, for Appellants.

*Charles E. Thompson,* Las Vegas; *Beckley, Singleton, Jemison & List* and *Daniel F. Polsenberg,* Las Vegas; *Freberg & Manley,* Irvine, California; *Law Offices of Terry M. Giles,* Rancho Santa Fe, California, for Respondents.

---

[2]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.

# OPINION

By the Court, SHEARING, C. J.:

Between 1973 and 1992, respondent Jerry Tarkanian ("Tarkanian") coached basketball at the University of Nevada, Las Vegas ("UNLV"). During this time, appellants National Collegiate Athletic Association, S. David Berst, and Robert L. Stroup, II (collectively the "NCAA"), investigated and found violations of NCAA legislation by the UNLV basketball program and Tarkanian, and implemented sanctions. In 1992 Tarkanian resigned from his coaching position at UNLV.

On November 30, 1992, Tarkanian and his wife filed a complaint alleging that the NCAA wrongfully attempted to force Tarkanian out of college coaching. On January 19, 1993, the Tarkanians filed an amended complaint. On March 22, 1996, the NCAA filed a motion for change of venue and request for evidentiary hearing. In its motion, the NCAA argued that a change of venue was proper because due to pretrial publicity, there was a reasonable likelihood that an impartial trial could not be held in Clark County. The motion was supported by the affidavit of Kent L. Tedin ("Tedin"), an expert in public opinion and statistics who conducted a public opinion poll in Las Vegas and Reno between February 23 and March 2, 1996; the affidavit of Steven Penrod ("Penrod"), an expert in pretrial publicity who conducted a content analysis of Las Vegas and Reno newspaper

coverage; and newspaper articles and videotapes of newscasts that the NCAA alleged showed bias against them and in favor of Tarkanian.

The Tarkanians' opposition to the NCAA's motion was supported by an affidavit by Robert Tortora ("Tortora"), a statistician who criticized the methodology used by Tedin and Penrod as leading to inaccurate assessments of the opinions or beliefs held by potential jury pools from Clark and Washoe Counties.

Initially the trial was set for May 28, 1996. On April 30, 1996, the district court filed an order denying the NCAA's motion for change of venue and request for evidentiary hearing. At the hearing on the motion, the court made the following oral findings:

> This motion is untimely because defendants base their request upon facts which were known or should have been known over five years ago when this case was first filed.
>
> In addition, during the passage of these five years the amount of media attention that this case has received has not only greatly diminished but it has literally disappeared. Professor Penrod's study relies predominantly upon media reports which are four years old or more. In addition the defendants have not taken into account the explosive growth of Clark County's population, which has brought huge numbers of people into the County during the past five years who are completely unfamiliar with this case. . . .
>
> Finally, this Court is not persuaded that an evidentiary hearing on defendant's test results would serve a useful purpose and therefore this request is denied.

The NCAA filed a timely appeal from the district court's order. The trial was stayed pending this appeal.

A motion for change of venue must be granted where there is a reasonable likelihood that in the absence of such relief, an impartial trial cannot be held. Martinez v. Superior Court, 629 P.2d 502, 503 (Cal. 1981) (citing Maine v. Superior Court, 66 Cal. Rptr. 724 (Cal. 1968)). Courts look to five factors to determine if venue should be transferred: (1) the nature and extent of pretrial publicity; (2) the size of the community; (3) the nature and gravity of the lawsuit; (4) the status of the plaintiff and defendant in the community; and (5) the existence of political overtones in the case. People v. Hamilton, 774 P.2d 730, 737 (Cal. 1989). The NCAA contends that the district court failed to consider these factors, and that an independent review shows that these factors favor a change of venue.

This court reviews a trial court's order denying a motion to change venue for a manifest abuse of discretion. *Fabbi v. First Nat'l Bank*, 62 Nev. 405, 414, 153 P.2d 122, 125 (1944), *cited in* *Pearce v. Boberg*, 87 Nev. 255, 256, 485 P.2d 101, 101 (1971). We independently review the record only to determine whether the lower court's decision was a manifest abuse of discretion. *See* State v. Ware, 338 N.W.2d 707 (Iowa 1983) (reviewing the record *de novo* to make an independent evaluation of the circumstances to determine whether there was an abuse of discretion); State v. Moyd, 619 P.2d 1107 (Haw. Ct. App. 1980) (rejecting *de novo* review).

The NCAA argues that pretrial publicity has been inflammatory and extensive and created widespread community bias against the NCAA.

Penrod analyzed 1,228 articles that mentioned UNLV basketball, Tarkanian, or the NCAA. These articles were published no later than 1992, four years prior to the trial date, by two newspapers, the *Reno Gazette Journal* and the *Las Vegas Review Journal*. Penrod's analysis shows that the *Las Vegas Review Journal* was four times more likely than the *Reno Gazette Journal* to print negative statements about the NCAA. Penrod found an additional five hundred *Las Vegas Review Journal* articles published between January 1993 and April 1996 that referred to Tarkanian, but he did not analyze those articles for content. Tedin's poll shows that Clark County bias in favor of Tarkanian and against the NCAA continued as late as March 1996.

Tortora criticized Penrod's analysis, noting that the link between the content of the articles and general attitudes about the target populations was unclear. Tortora also discussed design flaws in Tedin's survey, including the failure to implement procedures to eliminate nonresponse bias. Tortora stated, "there is no evidence to link the trends in the newspaper articles with the attitudes, opinion, and beliefs of those in [Tedin's] surveys." The record also shows that the population of Las Vegas grew from 858,232 in 1992, the year that the Tarkanians filed their complaint, to 1,028,228 in 1995. Thus, a large proportion of the potential jury pool was not exposed to the articles Penrod analyzed.

With a scant few exceptions, the newspaper quotations the NCAA characterizes as "inflammatory" were published several years before the May 1996 trial date. The most inflammatory of these quotations appeared in a single article published in 1992, and are attributed to Tarkanian's attorney and to the UNLV

basketball players' attorney. Whether or not these statements were inappropriate is not the issue in this appeal. The NCAA has failed to show that the Clark County jury pool was likely to have read these statements or shared in their sentiments.

We conclude that substantial evidence in the record supports the district court's ruling and that the district court did not manifestly abuse its discretion in denying the NCAA's motion for a change of venue and request for evidentiary hearing.

Because the trial court did not err in denying the NCAA's motion, it is unnecessary to address the NCAA's contention that a jury questionnaire cannot eliminate bias.

YOUNG and ROSE, JJ., concur.[1]

SPRINGER, J., dissenting:

In my opinion, the NCAA probably cannot get a fair trial in Las Vegas; therefore, I dissent.

In these kinds of cases, "[a]ppellate tribunals have the duty to make an independent evaluation of the circumstances." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). Although we have traditionally reviewed change of venue orders on the basis of whether there was "manifest abuse of discretion" in the trial court's ruling, it is my view that, given the constitutional dimensions of this case, we should conduct a *de novo* review of the record below. There is no reason in the present case why this court should not engage in an independent review of this matter and decide, independent of the trial court's ruling, the legal and constitutional question of whether there is a reasonable likelihood to believe that the NCAA cannot get a fair trial in Las Vegas.

What the record reveals is that for many years Mr. Tarkanian has been a folk-hero's folk-hero in Las Vegas, a "legend," the town's "biggest star," the "most powerful" person in Las Vegas and a man "who will never be forgotten." I can think of no one in the history of Las Vegas who can match the glory of this man; but there is someone that can match Mr. Tarkanian, not in glory, but in infamy—none other than the "embodiment of evil," the "Adolph Eichmann," the "Ayatollah" and the "Gestapo" of sportsdom, namely, the "barbaric" National College Athletic Association.

The picture is quite plain: Local folk-hero is wrongly and unfairly destroyed by a foreign devil which had "indulged in a 20-year conspiracy to drive [Tarkanian] from coaching" and to "ruin [Tarkanian's] name and reputation with the intent of running him out of coaching." Now representatives of the Las Vegas

---

[1]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.

community are being called upon, in jury empaneled, to pass judgment on whether their "ruined" folk-hero should be compensated for the harm claimed to have been caused to their hero by a wrongful conspiracy wrought by the hands of those "evil" NCAA people "in Kansas City." To my way of thinking, this case "represents exactly the type" of case where the place of trial must be changed. *See* Martinez v. Superior Court of Placer County, 629 P.2d 502, 503-08 (Cal. 1981).

All of the characterizations which I mention above (NCAA as being the villain, embodiment of evil, barbaric and the like; and the legendary Las Vegas celebrity, Mr. Tarkanian, as being the victim of a wrongful conspiracy perpetrated by the NCAA people from Kansas City) are matters not of occasional public comment but, rather, matters that have been the subject of the most extensive, saturating media coverage that has been afforded to any Las Vegas celebrity. The NCAA maintains, and I agree, that local prejudice—both ways—is so "widespread and deeply embedded into the community's consciousness that its biased effects cannot be alleviated." Even absent the social scientists' opinion supporting this conclusion, it is clear to me that the NCAA's position in this matter is correct.

Of course, it can be argued that the torrent of publicity has subsided and that no one in Las Vegas much remembers "Tark" any more. I think that the record belies such an argument; but even if it were correct, and even if the publicity has died down, the very nature of this lawsuit involves "peculiar" or "sensational" subject matter which "bring[s] it to the consciousness of the community," where it remains, virtually indelible to this day. *Martinez,* 629 P.2d at 502, 506. There can be little doubt from the record now before us that the consciousness of this community overwhelmingly supports its hero and overwhelmingly damns the evil villain from Kansas City. Mr. Tarkanian's case against the NCAA should not have to be tried under these circumstances.

The record shows that most people in Las Vegas want Mr. Tarkanian to win this lawsuit, and almost three out of four believe that the NCAA has done great damage to their university, UNLV. Even if this kind of data does not demonstrate that the NCAA cannot get a fair and impartial trial, permitting the trial to proceed in Las Vegas at least demonstrates an *appearance* of injustice. We must ask ourselves whether "justice satisfies the appearance of justice" and whether there is an "appearance of impartiality." In re Murchison, 349 U.S. 133 (1955). It most certainly *appears* to me that it is impossible for the NCAA to get a fair trial in Las Vegas; therefore, I dissent.