SICOR, INC., A DELAWARE CORPORATION; TEVA PARENTERAL
MEDICINES, INC., FORMERLY KNOWN AS SICOR PHAR-
MACEUTICALS, INC., A DELAWARE CORPORATION; BAX-
TER HEALTHCARE CORPORATION, A DELAWARE
CORPORATION; AND MCKESSON MEDICAL-SURGICAL,
INC., A DELAWARE CORPORATION, APPELLANTS, *v.* STACY
HUTCHISON; WILLIAM I. BILGER, JR., INDIVIDUALLY;
JOANNE ALLEN AND KENNETH G. ALLEN, INDIVIDU-
ALLY AND AS HUSBAND AND WIFE; JAMES M. WILLIAMS
AND HEIDI HAMILTON, INDIVIDUALLY AND AS HUSBAND
AND WIFE; AND MARIA V. PAGAN, RESPONDENTS.

No. 59506

December 15, 2011                                266 P.3d 608

*Lewis & Roca LLP* and *Daniel F. Polsenberg* and *Joel D.
Henriod*, Las Vegas, for Appellants.

*Matthew L. Sharp, Ltd.*, and *Matthew L. Sharp*, Reno; *Gillock
Markley & Killebrew, PC*, and *Gerald I. Gillock* and *Nia C. Kille-
brew*, Las Vegas; *Friedman Rubin* and *William S. Cummings*, An-
chorage, Alaska; *Friedman Rubin* and *Kenneth R. Friedman*, Bre-
merton, Washington, for Respondent Stacy Hutchison.

*Kemp, Jones & Coulthard LLP* and *Will Kemp*, Las Vegas;
*Mainor Eglet* and *Robert T. Eglet*, Las Vegas, for Respondents
William I. Bilger, Jr.; Joanne Allen; Kenneth G. Allen; James M.
Williams; Heidi Hamilton; and Maria V. Pagan.

Before SAITTA, C.J., DOUGLAS and HARDESTY, JJ.

## OPINION

By the Court, HARDESTY, J.:

In this appeal, appellants challenge the district court's post-voir dire denial of their motion for a change of venue in the underlying tort action. Having recognized the propriety of deferring consideration of such motions until after the completion of voir dire in our contemporaneously issued opinion in *Sicor, Inc. v. Sacks*, 127 Nev. 896, 266 P.3d 618 (2011), we now enlarge the test to be applied when evaluating post-voir dire motions for a change of venue based on pretrial publicity in civil proceedings. Expanding upon this court's analysis in *National Collegiate Athletic Ass'n v. Tarkanian*, 113 Nev. 610, 939 P.2d 1049 (1997), we hold that the

district court must apply a multifactor test to determine whether there is a reason to believe that the party seeking a change of venue will not receive a fair trial in the community where the case originated. Because appellants have not demonstrated that the circumstances presented here warrant a reasonable belief that a fair trial of this case could not be had in Clark County, we conclude that the district court did not manifestly abuse its discretion by denying appellants' motion for a change of venue.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants are manufacturers of an anesthetic drug, Propofol, which was used in certain medical procedures by nonparties, the Endoscopy Center of Southern Nevada and the Desert Shadow Endoscopy Center. In 2008, the Southern Nevada Health District issued letters to approximately 60,000 patients of these centers, warning the patients that they might have been exposed to bloodborne infections, including hepatitis B, hepatitis C, and HIV. These events have resulted in criminal investigations, bankruptcy proceedings by the two centers and their principal, Dipak Desai, and the filing of approximately 200 civil actions, including the underlying district court case, which have been covered by various media outlets, including newspapers, television stations, radio broadcasts, and Internet sites.

### The initial motion for a change of venue

The plaintiffs in the underlying action asserted product liability claims against appellants and various other claims against other defendants.[1] Before the beginning of the trial, appellants filed in district court a motion to change venue from Clark County, where the action was pending in Las Vegas, to Washoe County, arguing that adverse pretrial publicity reasonably prevented appellants from receiving a fair trial in Clark County. Appellants asserted that news coverage related to this case was pervasive and biased, vilifying the various defendants and engendering community sympathy for the former patients of the endoscopy clinics. Additionally, appellants contended that media coverage of one of the related civil actions, in which the jury had returned a $500 million punitive damages verdict against appellants, had further tainted the jury pool.

In support of their motion, appellants submitted a 2010 report discussing the results of a survey of the impact of media coverage on prospective jurors. The survey, which included 408 jury-eligible residents of Clark County and 392 jury-eligible residents

[1]When this appeal was docketed, trial was scheduled to go forward only as to appellants. The other defendants have either settled or were otherwise dismissed from the action.

of Washoe County, indicated, among other things, that 83 percent of Clark County participants acknowledged having heard of the endoscopy center litigation. In contrast, 53 percent of Washoe County participants indicated that they had heard of the litigation. This survey further reflected that 33.8 percent of Clark County participants and 6.6 percent of Washoe County participants had heard about a verdict against the appellant drug manufacturers in a related civil case.

With regard to the media reports covering the endoscopy center litigation, appellants listed 45 print articles published in the Las Vegas Review-Journal between April 2009 and April 2010 that purportedly mentioned the events at the endoscopy clinics. Appellants also identified 33 print articles and 52 Internet articles apparently related to the litigation published by the Las Vegas Sun during this period.[2] Appellants did not, however, submit copies of these articles. For the period between April 2010 and August 2011, appellants provided the district court with more than 160 newspaper and Internet articles, with the majority of the articles having been published between April and June 2010. These articles were taken primarily from six Las Vegas print and Internet sources, including the Review-Journal and the Sun. The articles largely included factual accounts of the progress of the first related civil lawsuit to go to trial and of the criminal proceedings against Dipak Desai and his staff. While the articles discussing the related civil trial identified the general allegations of that lawsuit, which were similar to the allegations in the instant case, statements asserting that appellants were liable to the endoscopy centers' former patients were generally attributed to respondents' attorneys, and many of the articles included rebuttal quotations from appellants' attorneys explaining their bases for denying liability. As to the articles discussing the criminal cases, to the extent that they mentioned appellants at all, such references were limited to brief statements noting the verdict in the related civil case.

Respondents opposed the motion for a change of venue, arguing that an attempt to seat a jury using questionnaires and proper voir dire would reveal that a venue change was not warranted. In arguing that the trial should be held in Clark County, respondents primarily noted that it is the largest county in the state, and thus, it has the largest jury pool. In support of this claim, they submitted data from the United States Census Bureau indicating that, in 2009, Clark County's population exceeded 1.9 million people, while Washoe County, the state's next largest county, had a population of approximately 414,800.

---

[2]Appellants submitted a 2005 list of the country's top 100 daily newspapers by circulation, indicating that the Review-Journal, combined with the Sun, had a daily circulation of 167,586, and a Sunday circulation of 220,723.

Upon consideration of the parties' initial arguments and the evidence presented, the district court concluded that a change of venue was not warranted at that time, and thus, the court reserved ruling on the motion until after an attempt to select a jury had been made.

## The jury-selection process

The appellate record shows that at the initial stage of the jury-selection process, the district court distributed approximately 500 questionnaires to potential jurors, asking, among other things, whether they had been exposed to information from any source about the parties, lawyers, or witnesses in this case. According to appellants, approximately 215 jurors were eliminated on the basis of these questionnaires. It appears, however, that a substantial portion—well over one-third—were excluded for reasons other than exposure to pretrial publicity.

### Individual interviews

After the exclusion of the approximately 215 potential jurors based on the questionnaires, the jury-selection process moved forward. Before proceeding to the next stage of the process, however, the district court explained to the remaining potential jurors that they were required to avoid all types of media in order to prevent themselves from being exposed to outside information about the case. The district court then examined how the pretrial publicity affected those who had already learned some information about the case. Not wanting to risk unnecessarily contaminating any venire-members, the district court and the attorneys conducted individual interviews, outside of the presence of the jury pool, with each potential juror who had indicated, either in a questionnaire or otherwise during the jury-selection process, that he or she had any prior awareness of the parties or the issues raised in this case.[3]

During this process, the district court conducted approximately 175 individual interviews. The potential jurors interviewed indicated that they had a range of knowledge regarding the case, which spanned from a very vague idea of the issues involved to a relatively sophisticated understanding of the circumstances underlying the case. The period in which they had most recently heard about

---

[3]Each day, the district court asked the prospective jurors to raise their hands to indicate whether they had any pretrial exposure to the case. It appears from the record and appellants' assertions that, in addition to the 145 potential jurors who expressed on their questionnaires that they had been exposed to pretrial publicity, approximately 30 more prospective jurors indicated during the individual voir dire process that they had received out-of-court information regarding the case.

the case also varied widely. Many of the prospective jurors had heard information about the related cases within a matter of days or weeks before voir dire, while others had last heard about the cases a few months to more than a year earlier.

A significant portion of the potential jurors, close to half, were passed for cause during this phase of the proceeding because they expressed that they had not formed any opinions that would affect their ability to impartially consider the merits of the case based on the evidence presented at trial. Conversely, approximately 90 potential jurors were excluded during this stage of the jury selection process. Of these prospective jurors dismissed at this stage, a few were released for reasons unrelated to preconceived bias, such as personal involvement with the case, medical concerns, or a connection to one or more of the attorneys. Nearly one-third of those excluded were released because they expressed firm opinions that appellants should not be held liable in this case. Some of the remaining prospective jurors were dismissed at this point because of a preformed opinion, based on their media exposure, against appellants, while others were released because of personal biases developed out of circumstances other than pretrial publicity. Very few of the jurors excluded at this stage were dismissed because they indicated that they believed respondents' cases had merit based on the fact that they had won previous cases against appellants.

Only four of the jurors who were ultimately seated on the jury were interviewed during the individual voir dire phase. As she had in her questionnaire, Juror 78 informed the court that she had heard on the news that doctors at a clinic were reusing needles. She also stated that she had heard that five people were awarded judgments in the millions of dollars in an earlier case. Juror 78 indicated that she may have a bias against doctors who reused needles, but that she had no other biases with regard to the case. She affirmed that she would be able to listen to the facts and evidence presented before making a decision as to the appropriate outcome of the trial, and she stated that she could be fair and impartial when considering the evidence. Appellants did not ask Juror 78 any questions or challenge her for cause.

Juror 190 acknowledged that his wife's uncle had been a patient at one of the clinics involved in the case, but stated that the uncle was not involved in any of the litigation. He further expressed that he had limited media exposure to the case based on information that "came out years ago." Juror 190 affirmed that he would be able to listen to the evidence and evaluate the facts presented before making a decision as to the issues involved. Moreover, he stated that he did not believe that either side would be starting with an advantage or disadvantage over the other side, based on what he

knew at that time. Appellants did not ask Juror 190 any questions or challenge him for cause.

Juror 257 stated that he had read about a similar case involving two of the appellants being prosecuted for Propofol contamination. He denied that what he had read had caused him to form any opinions or conclusions about who should win the case. He further stated that nothing he had heard should affect his ability to be fair and impartial and that he believed the parties would be starting from a neutral position. Finally, Juror 257 told the court that he had not formed any strong opinions about anything having to do with the case. Appellants did not ask Juror 257 any questions or challenge him for cause.

Juror 240 informed the court that she had heard about the case in the media and from doctors at the hospital where she worked. In particular, she had heard that patients had possibly been infected from a Propofol injection. She denied that anything she had heard would make it difficult for her to be fair and impartial, and she affirmed that she would be able to listen to the evidence presented and make a decision solely based on that evidence. Juror 240 stated that she had not formed any strong opinions on any issues related to the case, and she confirmed that the parties would be starting from the same position. Appellants did not ask Juror 240 any questions or challenge her for cause.

### Seating a jury

Following the completion of the one-on-one interviews, the court proceeded to the group voir dire stage, during which jurors were eliminated for reasons unrelated to media exposure. At the conclusion of voir dire, the parties exercised their peremptory challenges. Appellants used all of their peremptory challenges, but did not request any additional peremptory challenges. The final jury was then seated. The district court later noted that, when the jury was empaneled, approximately 30 additional potential jurors had been present in the courtroom, while 50 more had been available outside the courtroom.

### Appellants' renewed motion for a change of venue

Once the jury was empaneled, appellants renewed their motion for a change of venue, arguing that the jury-selection process had revealed that the pretrial publicity had been pervasive, resulting in the potential jurors having extensive pretrial knowledge of the details of the case. Appellants also argued that the release of the verdict in a second related civil trial just days before jury selection began in this case had created a new wave of media that had in-

fluenced the jury pool. Therefore, appellants contended that a change of venue was necessary because there was reason to believe that an impartial trial could not be had in Clark County. In support of their renewed motion, appellants submitted nine articles published on various Las Vegas media outlets' websites reporting on the verdict in the related civil case and four additional articles related to the criminal proceeding against Dipak Desai. As with the earlier news reports, these were largely factual accounts of the proceedings in the related cases.

Respondents opposed the renewed motion, mainly arguing that anyone who acknowledged having a bias based on exposure to negative publicity had been excused from the jury panel. The district court found that the media exposure was not pervasive and prejudicial to the extent that it was impossible, or even difficult, to seat a jury. Indeed, the court stated that the jury, as seated, would not only be fair and impartial, but also was comprised of an appropriate cross section of the community. Based on its ability to seat a satisfactory jury, the district court denied appellants' motion. This appeal followed.

## DISCUSSION

By statute, the district court may change the place of a civil trial on motion of a party "[w]hen there is reason to believe that an impartial trial cannot be had" in the county designated in the complaint. NRS 13.050(2)(b). An order denying a change of venue motion "may only be reviewed upon a timely direct appeal from the order and may not be reviewed on appeal from the judgment in the action or proceeding or otherwise." NRAP 3A(b)(6)(A). Generally, such an appeal stands submitted on the briefs and the record transmitted by the district court without further briefing in this court, but this court may order otherwise if it so chooses. NRAP 3A(b)(6)(B). This court will not overturn a trial court's order denying a motion for a change of venue absent a manifest abuse of discretion. *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 113 Nev. 610, 613, 939 P.2d 1049, 1051 (1997).

In *Sicor, Inc. v. Sacks*, 127 Nev. 896, 266 P.3d 618 (2011), which was decided contemporaneously with this appeal, we acknowledged that the district court has the authority to defer ruling on a pre-voir dire motion for a change of venue until after it has attempted to seat a fair and impartial jury. Thus, we focus our discussion in this opinion on the proper standard for evaluating the post-voir dire renewal of a motion to change venue. In light of the novelty of this issue, we directed the parties to provide supplemental briefing to assist in our review.

*Standard for evaluating post-voir dire motions for a change of venue*

Appellants argue that, regardless of when a change of venue motion in a civil case is considered, the standard for evaluating such a motion is whether, under the five-factor test set forth in *National Collegiate Athletic Ass'n v. Tarkanian*, 113 Nev. 610, 939 P.2d 1049, there is a reasonable likelihood that the party seeking to change venue will not receive a fair trial. Appellants acknowledge that the empanelment process may be used as evidence to evaluate the effect of pretrial publicity on the jury pool, but assert that such evidence must be considered in the context of the other *Tarkanian* factors. Additionally, appellants contend that, applying the factors here, they were entitled to a change of venue because the media coverage of this and related cases was pervasive and prejudicial.

Respondents argue that the circumstances demonstrate that it was possible to empanel an impartial jury in Clark County, noting that two such juries have also been seated in cases closely related to this one. Respondents further contend that, in this case, appellants were given ample opportunity to fully explore any potential juror bias and that the district court ultimately empaneled an impartial jury with little to no problems in doing so. On appeal, respondents ask this court to look at the jury that was actually seated to determine whether appellants were entitled to a change of venue. They assert that a review of the voir dire process shows that the seated jurors could, in fact, be fair and impartial.

In the civil context, this court has only addressed a motion to change venue based on pretrial publicity brought prior to the selection of the jury. *Tarkanian*, 113 Nev. 610, 939 P.2d 1049. In *Tarkanian*, the court was confronted with an action filed by former University of Nevada Las Vegas basketball coach Jerry Tarkanian against the National Collegiate Athletic Association (NCAA), asserting that the NCAA had wrongfully attempted to force him out of college-level coaching. *Id.* at 611, 939 P.2d at 1050. Based on pretrial publicity in favor of Tarkanian, the NCAA moved, prior to selection of the jury, for a change of venue, arguing that there was not a reasonable likelihood that it could receive a fair trial in Clark County. *Id.* at 611-12, 939 P.2d at 1050. The district court denied the motion, and the NCAA appealed. *Id.* at 612, 939 P.2d at 1050-51.

On appeal, the *Tarkanian* court relied on two California opinions, *Martinez v. Superior Court of Placer County*, 629 P.2d 502 (Cal. 1981), and *People v. Hamilton*, 774 P.2d 730 (Cal. 1989), for the proposition that the trial court must grant a motion to

change venue if there is a "reasonable likelihood" that an impartial trial cannot be had in the original venue. *Tarkanian*, 113 Nev. at 612, 939 P.2d at 1051. The court referred to five factors used by the California courts in evaluating a motion for a change of venue based on pretrial publicity: "(1) the nature and extent of pretrial publicity; (2) the size of the community; (3) the nature and gravity of the lawsuit; (4) the status of the plaintiff and defendant in the community; and (5) the existence of political overtones in the case." *Id.* (citing *Hamilton*, 774 P.2d at 737-39). Without specifically enumerating it as a separate factor, the *Tarkanian* court also considered (6) the amount of time that separated the release of the publicity and the trial. *Tarkanian*, 113 Nev. at 613-14, 939 P.2d at 1051-52. After examining the situation in that case in light of certain of these six factors, the *Tarkanian* court ultimately concluded that a change of venue was not warranted. *Id.* at 614, 939 P.2d at 1052.

While the *Tarkanian* case is instructive with regard to evaluating pre-voir dire change of venue motions, nothing in that opinion or the civil venue statute prevents a district court from attempting to seat an impartial jury before finally deciding a change of venue motion. *See Sicor, Inc. v. Sacks*, 127 Nev. 896, 266 P.3d 618 (2011); *see also* NRS 13.050; *Tarkanian*, 113 Nev. 610, 939 P.2d 1049. Of course, once such an attempt has been made, neither the district court nor this court may ignore the realities of the voir dire process. *See Hamilton*, 774 P.2d at 737 (noting that a post-trial review of a change of venue motion is retrospective and involves an examination of the voir dire process). Indeed, if the court could ignore the jury selection proceedings, there would be no reason to attempt to seat a jury before deciding a motion for a change of venue.

Nevertheless, the jury selection process cannot be the only criteria for evaluating a change of venue motion post-voir dire. Because, in the civil context, the party seeking a change of venue will not be able to have the denial of a venue motion reviewed on appeal from a final judgment, *compare* NRAP 3A(b)(6)(A) (providing that review of a change of venue motion in a civil action may only be had upon timely appeal from the denial of the motion and not on appeal from a final judgment), *with* NRS 174.455(3) (explaining that a denial of a change of venue motion in a criminal action may only be reviewed on appeal from a final judgment), it is vital for a court addressing a post-voir dire change of venue motion to give full consideration to the trial atmosphere to account for the possibility of prejudice that could be hidden during the voir dire process or even unrealized by the potential jurors themselves. Thus, the six factors identified in *Tarkanian* remain relevant, even

after an attempt to seat a jury has been made, as they give due consideration to the environment in which the trial is set to be held. *See Tarkanian*, 113 Nev. at 612-13, 939 P.2d at 1051. After an attempt to seat a jury has been made, however, the factors must be considered in light of any information received during the voir dire process. *See Hamilton*, 774 P.2d at 737.

In addition to considering the six *Tarkanian* factors in light of the jury-selection process, however, a post-voir dire review of a change of venue motion should also involve direct consideration of the voir dire proceedings to the extent that they are relevant to the motion. To this extent, we believe that the following additional factors will be useful in considering future post-voir dire change of venue motions: (7) the care used and the difficulty encountered in selecting a jury, (8) the familiarity of potential jurors with pretrial publicity, (9) the effect of the publicity on the jurors, and (10) the challenges exercised by the party seeking a change of venue. *See Unger v. Cauchon*, 73 P.3d 1005, 1007-08 (Wash. Ct. App. 2003) (identifying the above factors as relevant to a change of venue motion). We stress that, when applying this multifactor test, the issue is not whether the potential jurors have learned information about the case outside the courtroom, as "an ignorant jury is neither the hallmark nor the *sine qua non* of a constitutionally qualified jury." *Ford v. State*, 102 Nev. 126, 129, 717 P.2d 27, 29 (1986). The question instead is whether there is a reason to believe that the community in which the case has been brought will not "yield a jury qualified to deliberate impartially and upon competent trial evidence." *Id.*; NRS 13.050(2)(b) (providing that the district court may change the place of trial "[w]hen there is reason to believe that an impartial trial cannot be had" in the original venue).

### Applying the standard

Having set forth the standard for addressing post-voir dire venue motions, we turn to the voir dire proceedings in this case. For continuity of our discussion, we take the applicable factors out of the order in which they are identified in the above discussion.

### Size of the community

While the size of the community is not dispositive, it is certainly significant that Clark County has, by far, the largest population, and thus, the largest jury pool, of any county in the state. Indeed, according to the 2009 data before us, Clark County's population of more than 1.9 million people is more than 4 times that of Washoe County, the next largest county in the state and the county to which appellants sought to have the trial in this case transferred.

Thus, the potential for dilution of the information and for a greater number of untainted jurors is far greater in Clark County than elsewhere in the state, and this factor does not weigh in favor of a venue change. *See Martinez v. Superior Court of Placer County*, 629 P.2d 502, 506 (Cal. 1981) (recognizing that courts are more likely to deny a motion for a change of venue when the trial is scheduled in a populous urban area).

### Nature and gravity of the lawsuit

Without a doubt, the events underlying this case have seriously impacted the lives of thousands of Clark County citizens. But the record does not demonstrate that this is the kind of case that has ignited the emotions of the community against appellants or otherwise created an atmosphere that would prevent them from receiving a fair trial. *See Ford*, 102 Nev. at 130, 717 P.2d at 30 (considering whether pretrial publicity had so corrupted the trial atmosphere as to preclude a fair trial). Instead, the jury selection process demonstrated that the potential jurors' feelings did not run strongly either in favor of or against appellants based on the nature of the case, but that their opinions varied from person to person. Thus, appellants have not shown that the nature and gravity of the lawsuit weighed in favor of transferring the place of trial.

### Nature and extent of pretrial publicity

Appellants submitted a plethora of newspaper and Internet articles regarding the initial incidents at the clinics, the first civil cases to go to trial and reach a verdict, and the criminal investigation and proceedings related to Dipak Desai and his staff. While some of these articles expressed outrage over the actions of Desai and the clinic employees, the same level of emotion was not found in the articles that discussed the civil trials or appellants' involvement in these cases. In fact, contrary to appellants' characterization of the pretrial publicity as prejudicially vilifying them, much of the reporting with regard to appellants was limited to factual accounts of their role in the litigation. Additionally, any accusatory statements regarding appellants' potential liability were generally attributed clearly and directly to respondents, and many such statements were countered with appellants' own explanation of their position in the case. Thus, our review of this evidence does not reveal the kind of inflammatory or polarizing material associated with a need for a change of venue. *See id.*

### Time between the publicity and the trial

In this case, the bulk of the media reports submitted for consideration with appellants' motion to change the place of trial

were published just under a year and a half before the voir dire proceedings began. The publicity was renewed, however, in the days and weeks leading up to jury selection, when a verdict in one of the related civil cases was released. Thus, these media reports were fresh in the minds of some of the prospective jurors. The jury selection process confirmed that a number of potential jurors were aware of this recent media, stating in the individual voir dire sessions that they had heard information about the case in the preceding days and weeks before voir dire. Nevertheless, it does not appear that this burst of media was as pervasive as the earlier publicity, as other prospective jurors stated that they had last received information about the case months or even years before the jury selection process began. Under these circumstances, this factor does not weigh strongly for or against a change of venue.

### Potential jurors' familiarity with the publicity

As to the potential jurors' exposure to this media, just under half of the potential jurors who filled out questionnaires denied having any prior knowledge of the case. Although approximately 30 of those prospective jurors later indicated, during the individual voir dire proceedings, that they had received some outside information about the case, a significant proportion of the jury pool remained free from any awareness of pretrial exposure to the issues involved in this case. Moreover, of the jurors who had learned something about the case through the media, the levels of exposure varied greatly, with several potential jurors having heard very little about the circumstances of the case, while others had followed the events closely. Not surprisingly, most of the potential jurors with some knowledge of the case fell somewhere in between these two extremes, with many expressing that they had a general idea about the allegations underlying the case but not a significant understanding of the details. Considering that many of the prospective jurors had limited knowledge or no knowledge of the publicity, this factor weighs against a change of venue in this case.

### Effect of the publicity on potential jurors

As discussed above, the media reports regarding appellants were generally factual reports, and the jury selection process did not reveal that the publicity had an overwhelming effect on the opinions of the veniremembers. In fact, of the potential jurors dismissed based on a preconceived opinion, approximately one-third were excluded because they held a strong bias in favor of appellants. A number of potential jurors were also eliminated based on general biases developed from personal experiences, rather than based on any pretrial publicity that they had seen or read. Only a very small

number of potential jurors indicated that the fact that previous plaintiffs had won cases against appellants might influence their consideration of this case; those potential jurors were promptly excused from this case. While some jurors were dismissed because they had formed strong opinions against respondents based on media accounts of the case, the overall jury selection process did not show that the pretrial publicity had a substantial effect on the jury pool, and thus, this factor also weighs against changing the venue.

### *Care used and difficulty in selecting a jury; challenges used*

The district court took great care during the jury-selection process in this case, and thus, it was not quick, but our review of the record also shows that it was not particularly difficult. By starting with a large pool of potential jurors, the district court was able to liberally dismiss any jurors who indicated that they had a bias coming into this case. With the court routinely dismissing such jurors, appellants needed to raise very few challenges for cause, and none of the few expressly challenged jurors remained on the final panel. Additionally, appellants exercised all of their peremptory challenges but did not request any additional peremptory challenges to attempt to eliminate the few seated jurors who had been exposed to pretrial publicity related to the case. The record further shows that appellants also did not try to challenge any of the seated jurors for cause. And despite dismissing a number of jurors throughout the process, a significant pool of available jurors remained after the individual voir dire sessions, as well as after the final jury was seated. Indeed, following group voir dire and the seating of the jury, the district court noted that some 30 potential jurors had remained in the courtroom, while another 50 had been available outside the courtroom. As a result, this factor does not weigh in favor of a change of venue.

### *Status of the parties; political overtones*

Finally, none of the evidence presented in this case has demonstrated that either the status of the parties or any political overtones are factors that should have a significant impact on the consideration of the change of venue motion in this case.

Having considered the relevant standard, we conclude that each of the six *Tarkanian* factors and the four additional factors identified herein either weighs against changing the venue from Clark County or does not have a significant impact on the analysis of the change of venue motion in this case. In summary, the record evidence demonstrated that, although this case and the related cases

received a fair amount of pretrial publicity, some of which was viewed by potential jurors, it was not of a kind or to the extent that it tainted the jury pool, leading to a reasonable belief that appellants could not receive a fair trial in Clark County. Therefore, the district court did not manifestly abuse its discretion by denying the motion for a change of venue, and we affirm the district court's order denying that motion.[4]

SAITTA, C.J., and DOUGLAS, J., concur.

___

[4]In light of this opinion, we vacate the stay of the district court proceedings ordered by this court on October 27, 2011. We note that the instant trial has been stayed for a relatively extended period of time, with the empaneled jurors having been instructed to avoid exposure to media related to this case. Appellants have suggested that a likelihood exists that the jury will not be able to stand as seated once the trial is resumed because of exposure to publicity during the break. At this point, we have no reason to believe that the jurors are not following the instructions given by the court that they must avoid gaining any outside information about this case. If, however, on the resumption of the trial, evidence were to arise demonstrating that the jurors in this case were accessing media while the case was stayed, such a circumstance may raise an issue of juror misconduct, but would not be relevant to the change of venue motion itself.

To the extent that appellants seek review of the district court's denial of their motion for reconsideration, that order is not substantively appealable. *See Alvis v. State, Gaming Control Bd.*, 99 Nev. 184, 660 P.2d 980 (1983), *disapproved on other grounds by AA Primo Builders v. Washington*, 126 Nev. 578, 245 P.3d 1190 (2010). Additionally, under our decision in *Sicor, Inc. v. Sacks*, 127 Nev. 896, 266 P.3d 618 (2011), we lack jurisdiction to consider appellants' appeal from the district court order deferring ruling on appellants' motion to change venue.